**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **VICTORIA FULLER**,<br><br>                        Plaintiff,<br><br>           -against-<br><br>**INTERVIEW, INC**.; **BRANT PUBLICATIONS, INC**., as the owner of Interview, Inc.; **PETER BRANT**, individually and as the shareholder and owner of Brant Publications, Inc.; **SANDRA J. BRANT**, individually and as the shareholder and owner of Brant Publications, Inc.; and **DEBORAH BLASUCCI**, individually and as the Executive Vice President and Chief Financial Officer of Interview, Inc. and Brant Publications, Inc.,<br><br>                   Defendants. | Civ. Action No.: 07 cv. 5728 (RJS/DCF)<br><br>**SECOND PROPOSED**<br>**AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Victoria Fuller, by her attorneys, the Law Offices of Alan J. Rich, LLC, as and for her complaint against Defendants, alleges as follows:

## THE PARTIES

1.      Plaintiff, Victoria Fuller ("Fuller" or "Plaintiff"), is a citizen of the State of New York, residing in, Kings County.

2.      Defendant, Brant Publications, Inc. ("Brant" or "Defendant"), is a corporation authorized to do business in New York State with its principal place of business located in New York County at 575 Broadway, 5th Fl., New York, New York 10012.

3.      Defendant, Interview, Inc. ("Interview" or "Defendant"), is a privately held company.

4.      At all times relevant to this action, Interview, Inc., published Interview Magazine.

5.      From approximately 1987 to date, Brant has owned, directly or indirectly, Interview, Inc.

6.      Defendants Peter Brant ("Peter Brant" or "Defendant") and Sandra J. Brant ("Sandra Brant" or "Defendant") were married and had five children together.

7.      Between December 2006 and March 2007, Interview was wholly owned by shareholders Peter Brant and Sandra Brant through intermediate corporations, including, but not limited to, Brant.

8.      Between December 2006 and March 2007, Brant was owned by shareholders Peter Brant and Sandra Brant.

9.      Interview is wholly owned, at present, by shareholder Peter Brant directly and/or through intermediate entities, including, but not limited to, Brant, and is located in the same business offices as Brant.

10.     Peter Brant pleaded guilty to federal charges for failure to keep proper tax records and for billing personal expenses to his newsprint companies.

11.     Peter Brant served 84 days in federal prison in connection with the above federal charges.

12.     As a consequence of his federal criminal record, Defendants Brant Publications, Inc., and/or Interview, Inc., had difficulty obtaining financing.

13.     At relevant times herein, Defendant, Sandra Brant, was the Publisher of Interview magazine, as well as the Chief Executive Officer and President of Brant.

14.     The position of Publisher of a magazine is traditionally to administer and to be responsible for the business, non-editorial aspects of the publication, including, but not limited to advertising, printing, distribution and sales and, more recently, Internet based operations.

15.     In or about January 2008, Defendant, Sandra Brant, sold her interest in Brant to Peter Brant, and/or entities owned directly or indirectly by Peter Brant, and was removed as the Publisher of Interview magazine, as well as the Chief Executive Officer and President of Brant.

16.     With the sale of Defendant, Sandra Brant's ownership interest in Brant to Peter Brant, Ingrid Sischy, resigned as Editor-In-Chief of Interview Magazine.

17.     Ingrid Sischy, was and is the domestic partner of Sandra Brant.

18.     Ingrid Sischy's 18-year tenure as Editor-In-Chief at Interview Magazine, continued during the entire time that Sandra Brant had an ownership interest in Interview.

19.     Defendant, Peter Brant, is the Chairman of Brant.

20.     Defendant Peter Brant, is an American newsprint industrialist, art collector, and film producer. He is the Chairman and C.E.O. of White Birch Paper Company, a private company, headquartered in Greenwich, Connecticut. Brant is also the owner of Brant Publications, Inc., which specializes in publishing about art in America

and antiques via its three magazines: *Interview* (founded by Andy Warhol), *Art in America*, and *The Magazine Antiques*.

21.     Peter Brant is the owner of a world-class modern art collection.

22.     Peter Brant was the Executive Producer of the 1996 film Basquiat and the 2000 film Pollock, in which his wife, Stephanie Seymour, a/k/a Stephanie Brant, had an acting role.

23.     Peter Brant is divorced from his first wife, Defendant, Sandra Brant, former Publisher of Interview Magazine.

24.     Peter Brant was an initial investor and long time shareholder in computer games company Take-Two Interactive, maker of "Grand Theft Auto," a best-selling video game.

25.     Ryan A. Brant, son of Peter Brant, was a founder and CEO of Take-Two Interactive.

26.     Since 2008, Ryan Brant has performed *de facto* functions as Publisher of Interview in that he was given authority to carry out or oversee many of the tasks of a Publisher.

27.     In February 2007, Ryan Brant pleaded guilty to felony charges of false filing in connection with a six-year stock-option backdating scheme.

28.     In 2001, the SEC sued the Take-Two Interactive for conspiring to inflate earnings. Mr. Brant, the company and his associates settled those charges in 2005 for about $14 million and restated four years of earnings.

29.     In 2008, Defendant, Peter Brant, hired Alan Katz as Publisher of Interview Magazine.

30.     In late 2008, Defendant, Peter Brant, terminated Alan Katz as Publisher of Interview.

31.     Peter Brant hired Samantha Fennell, former Associate Publisher of Elle, to become Publisher of Interview Magazine effective February 2, 2009.

32.     Samantha Fennell accepted the position of Publisher of Interview Magazine but reversed her position after learning that Interview's co-editorial director Fabien Baron and creative director Karl Templer had been terminated.

33.     Peter Brant never advised Samantha Fennell of the termination of Fabien Baron and Karl Templer.

34.     After Barron and Templer suddenly left, Ms. Fennell did not to report to work as Publisher as per her scheduled February 9, 2009 start date.

35.     A few years prior to Plaintiff's termination, Plaintiff, Victoria Fuller personally, hired David Hamilton ("Hamilton")  to work as an advertising sales representative at Interview.

36.     At the time Plaintiff hired Hamilton as a sales representative, he had no prior advertising sales experience.

37.     Hamilton worked under the supervision of Plaintiff, Victoria Fuller, during her tenure at Interview.

38.     After Ms. Fennell decided not to accept the position of Publisher, in or about February 2009, David Hamilton, was appointed Publisher.

39.     While Associate Publisher at Interview Magazine, Plaintiff, Victoria Fuller, regularly performed major functions of Publisher of Interview,

particularly because Publisher, Sandra Brant was frequently out of the office for a variety

of reasons.

40.    Plaintiff, Victoria Fuller, was fully qualified to carry out the duties

of Publisher of Interview Magazine.

41.    Had Victoria Fuller not been improperly targeted by Defendants

wrongful acts as described herein, Fuller would have been the likely and natural choice

for the position of Publisher, and would be Publisher of Interview today.

42.    Defendant, DEBORAH BLASUCCI ("BLASUCCI" or

"Defendant"), was and is currently serving as the Executive Vice President and Chief

Financial Officer of Interview and Brant.

## JURISDICTION AND VENUE

43.    Original jurisdiction of this Court is founded upon 28 U.S.C.

§1331 and 1332 (a), *et. seq*., in that this is a civil action wherein the matters in

controversy arise under the laws of the United States, 29 U.S.C. § 2615.

44.    This Court has personal jurisdiction over the Defendants named in

the complaint pursuant to 29 U.S.C. § 2617(a) because the Defendants conduct business

in this district and because an act proscribed by 29 U.S.C. § 2615 occurred within this

district.

45.    Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and (c),

and 29 U.S.C. § 2615, because the Defendants conduct business in this district, and all

the acts, omissions and events giving rise to the violations of 29 U.S.C. § 2601 alleged in

the complaint occurred in this district.

## SUMMARY OF CLAIMS

46.     On December 7, 2006, Plaintiff was diagnosed with acute gastroenteritis and requested reasonable accommodations from Defendants and time for medical leave and to seek treatment.

47.     In response to Plaintiff's taking medical leave, Defendants discriminated and retaliated against Plaintiff for seeking medical leave and reasonable accommodation of her disability by, among other things: (a) refusing to pay Plaintiff's full compensation to which she is lawfully entitled; (b) engaging in an intentional campaign designed to undermine and sabotage Plaintiff in carrying out her job responsibilities; (c) created a hostile environment by demanding that Plaintiff not communicate with any Interview staff or clients, as well as undermining Plaintiff's authority and marginalizing her management role, in an effort to force her from her employment; (d) when Plaintiff did not resign, Defendants sought to discharge her "for cause," thereby avoiding paying some $356,015.89 in severance pay and encouraged, supported and accepted the fabrication of claims of fraud and theft against Plaintiff; (e) and ultimately terminating her employment. Defendants discriminated and retaliated against Plaintiff, and/or aided, abetted and conspired with the other Defendants, *inter alia,* in permitting, assisting and advising Defendants to perpetrate a fraud upon Plaintiff, by fabricating knowingly false claims for Defendants to use and assert and to deprive Plaintiff of her rights and compensation. Defendants exhibited extreme and outrageous conduct intentionally and/or recklessly causing severe emotional distress to Plaintiff, and are therefore liabile for such intentional infliction of emotional distress. In the alternative, Plaintiff claims Defendants acts constituted a *prima facie* tort in that Defendants engaged

in: (1) the intentional infliction of harm, (2) resulting in special damages, (3) without any excuse or justification, (4) by an act or a series of acts which would otherwise be lawful.

48.     Subsequent to Plaintiff's return to work from her first medical leave, Plaintiff requested further reasonable accommodation of Defendants to permit her to take sick leave for surgery to treat previously diagnosed but untreated perineorrhaphy - a progressively debilitating medical condition. In response, Defendants terminated Plaintiff's employment because of her disability. While on that leave, Defendants further discriminated and retaliated against Plaintiff and otherwise acted wrongfully as described herein, including, but not limited to suspending and terminating Plaintiff while on medical leave.

49.     In this action, Plaintiff seeks: (i) compensatory and statutory liquidated damages, along with statutory attorneys' fees for Defendants' willful violation of Plaintiff's rights under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et. seq.*; and (ii) compensatory and punitive damages for Defendants' willful violation of Plaintiff's rights under the New York State Executive Law § 296, *et. seq.* and the New York City Administrative Code § 8-502(a), et. seq. Defendants intentionally inflicted harm, without excuse or justification, through acts that would otherwise be lawful, constituting a *prima facie* tort. Defendants also acted with extreme and outrageous conduct intentionally causing Plaintiff severe emotional distress by defendants fabricating claims that Plaintiff engaged in acts of fraud and theft and other acts constituting crimes. Defendants humiliated Plaintiff to those over whom she had direct supervisory authority, by spreading and causing such false rumors to be spread, by intentionally isolating Plaintiff from her fellow employees and clients by directing her

and her co-employees not to contact each other, using the enforced isolation to create and fabricate false claims against Plaintiff, and other intentionally outrageous, humiliating and intentionally injurious acts.

## FACTS COMMON TO ALL CLAIMS

### *Fuller's Employment*

50.     Plaintiff commenced her employment at Interview on, or about, February 14, 1994, in the capacity of Fashion Advertising Manager.

51.     In, or about April of 1994, Plaintiff was promoted to the position of Fashion Director with added responsibilities for managing the majority of the client accounts in the fashion, accessories and jewelry sector of the market.

52.     In, or about, March of 1996, Plaintiff was promoted to the position of Interview's Advertising Director, reporting directly and exclusively to the magazine's President, CEO and Publisher, Sandra Brant.

53.     In this new position of Interview's Advertising Director, Plaintiff's scope of responsibilities was expanded to include direct supervision and management of the Sales, Promotion and Marketing Departments at Interview.

54.     In, or about, April of 1998, Plaintiff was promoted to the position of Interview's Associate Publisher, with an expansion of the corresponding responsibilities and managing authority, including, among other things, recruitment, training, direction and management of the sales staff and independent agents for the territories of the United States, Italy and France.

55.     On, or about, August 15, 2002, Interview and Plaintiff executed and made effective the Employment Agreement (the "Employment Agreement"), memorializing in writing the terms and conditions governing Plaintiff's employment, including her duties and compensation, along with the specific obligations and responsibilities of each party to the other.

56.     The Employment Agreement was amended on or about August 27, 2003 and on or about April 23, 2004. The "Employment Agreement" as referred to herein, includes these amendments.

57.     In, or about, February of 2004, Plaintiff was promoted to the position of Interview's Vice President and Associate Publisher, with the corresponding expansion of responsibilities and managerial authority.

58.     During her tenure at Interview, Plaintiff was directly and proximately responsible for the expansion of Interview's advertising revenue more than threefold by, among other things, developing new client accounts in the heretofore underdeveloped sectors of the market and substantially increasing revenue from certain key accounts that Plaintiff was responsible for servicing personally.

59.     At all relevant times, Plaintiff performed her duties in an exemplary manner.

60.     No disciplinary actions for cause, nor any other disciplinary nor adverse employment actions, had ever been taken by Defendants against Plaintiff prior to the actions referred to in this Complaint.

61.     At all relvant times, Defendants had a responsibility to maintain a work environment free of unlawful discrimination and retaliation.

**Plaintiff's Medical Leaves and Defendants' Willful Violations of Plaintiff's Rights**

### A. *Plaintiff's First Medical Leave*

62.     On, or about, December 7, 2006, Plaintiff suffered severe abdominal pains and left work in the early afternoon to seek urgent medical attention from her attending physician, Dr. Jerry Clements, M.D. ("Dr. Clements").

63.     On December 7, 2006, upon completion of the examination, Dr. Clements diagnosed acute gastroenteritis as the principal cause of Plaintiff's illness and instructed her not to return to work and to take an immediate one month medical leave. Plaintiff's health condition was to be reassessed at the end of that initial medical leave period.

64.     On the afternoon of December 7, 2006, Interview's Director of Human Resources, Ms. Marie Mascaro ("Mascaro " or "HR Director"), received a medical note from Dr. Clements, stating that Mrs. Fuller was to go on medical leave effective immediately for a period of one month.

65.     Later that day, Plaintiff phoned Mascaro and confirmed her receipt of the doctor's note, informed Mascaro of the need for an immediate medical leave and to request the necessary forms to apply for the Short-Term Disability ("STD") benefits.

66.     At no time prior to the onset of Plaintiff's illness did Defendants post the required public notice explaining employees' rights to a medical leave pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et. seq.* ("FMLA"), or furnish other material informing Plaintiff of her foregoing statutory rights.

67. On, or about, December 8, 2006, Plaintiff's husband, Mr. Graham Fuller, received in person from Mascaro the STD benefits claim documents, to be prepared and submitted by Plaintiff.

68. In, or about, afternoon of December 8, 2006, Plaintiff contacted her executive assistant by phone and requested to have certain work files forwarded to Plaintiff's home so that she could continue with her work to the degree her condition permitted.

69. Fuller was informed that her assistant was instructed by the Defendants not to comply with her requests.

70. Plaintiff also attempted to remotely access work-related records on her office computer, only to find that such heretofore customary and regular course of business remote access had been summarily terminated by Defendants, without any prior notice to Plaintiff.

71. Plaintiff attempted to engage in an interactive process so that she could continue to perform work related functions and assist in the performance of her tasks as Associate Publisher and obtain reasonable accommodations to her disability while out of the office.

72. Plaintiff's attempts to engage in an interactive process were rejected by Defendants.

73. On the evening of December 8, 2006, Defendants' Human Resources Director, Marie Mascaro emailed Plaintiff:

"We will temporarily reassign staff to deal with clients and other related matters, [to] assure that all tasks are performed… Accordingly, **you should not contact clients or staff during your period of disability leave**. **We need to avoid miscommunications** and are concerned that our hard work would be counterproductive if you attempt to continue to perform tasks. …I understand you requested certain files to be sent to you at home. In light of the above, we do not think it appropriate to send work to you at home. Since your assistant will be temporarily reassigned, and in order to avoid any confusion, please direct any questions or concerns to Debbie or me." [*emphasis supplied,* P 0078]

74.     Defendants cut Plaintiff off from Interview and Brant employees to isolate her and to hide from that Plaintiff the common knowledge in the office that Defendants were terminating Plaintiff's employment.

75.     Defendants took actions to isolate Plaintiff from contact with her subordinates, clients and colleagues at Interview and from all work related matters. Defendants also acted to turn and manipulate employees and others against Plaintiff in an unprecedented fashion and contrary to regular course of business practices throughout Plaintiff's tenure at Interview.

76.     Immediately upon Plaintiff's taking medical leave on December 7, 2006, Defendants, unbeknownst to Plaintiff, changed the lock on her office door. [*see* BRANT ARB 25016].

77.     Defendants specifically directed Plaintiff not to communicate with her own administrative assistant.

78.     Defendants had never before directed any employee not to contact staff and clients while that employee was on medical leave, nor while on any other leave or vacation of any kind.

79.     This was the only occasion in company history that Defendants forced the isolation of an employee on medical leave.

80.     Defendants had created an environment so hostile that they intimidated employees for merely inquiring about Plaintiff, Victoria Fuller, to other employees. [BRANT ARB 25169[1]]

81.     On December 7, 2006, the day Plaintiff, Victoria Fuller, advised Defendants that she needed to take her medical disability/FMLA leave, notwithstanding supporting medical documentation, Defendant DEBORAH BLASUCCI immediately acted in a hostile manner to Plaintiff and asked employees at Interview to report to her whether Mrs. Fuller *"looked sick."*

82.     Defendants attempted to make and foment false claims about Plaintiff without her knowledge, to isolate her and to generally impose an environment so hostile as to cause Plaintiff to resign.

83.     Such hostile actions, among others, were discriminatory.

84.     Defendants used Plaintiff's FMLA leave as an opportunity to isolate Plaintiff, discriminate against her and to create an environment so hostile that she would resign.

85.     Immediately after Plaintiff indicated she was taking a medical/disability leave, Ms. BLASUCCI first orally asked Vince Frezzo, Executive Beauty Director of Interview, if Mrs. Fuller had "looked sick" at a client meeting at

---

[1] References to BRANT ARB and BRANT ARB HC, refer to exhibits provided by Defendants and are two different sets of documents.

Biotherm's offices. BLASUCCI was seeking a pretext to take some action against
Plaintiff and/or her right to take her medical/disability leave.

86.     Where Interview was given medical documentation that Plaintiff
was taking medical leave due to gastroenteritis, a company employee's non-medical
opinion about whether Plaintiff "looked sick" would not have been relevant, and could
likely provide misinformation. Seeking an unqualified co-employee's opinion about
Plaintiff's medical condition, demonstrated Defendants' hostile attitude and attempt to
find some pretext to discriminate against Plaintiff.

87.     If Defendants wished to inquire about Plaintiff's medical
conditions and/or her ability to perform work, they were obligated to and had the full
opportunity to communicate with Plaintiff, obtain further medically related information
and/or obtain an independent medical opinion.

88.     Defendants chose not to communicate with Plaintiff about her
medical condition and refused to attempt to have an interactive process with Plaintiff to
discuss what work she would be able to perform while on leave and how that could be
achieved.

89.     Defendants also did not seek any further medical information from
Plaintiff's physicians nor seek any independent medical opinion to investigate or
challenge Plaintiff's medical problems, her abilities or how to accommodate her medical
condition.

90.     In Defendants' further effort to undermine Plaintiff's right to a
medical leave, David Hamilton, who was Plaintiff's subordinate, sought to establish that
Plaintiff was not ill and on December 7, 2006.

91.     On December 7, 2006, Hamilton wrote to Vince Frezzo, with a courtesy copy to DEBORAH BLASUCCI, "These are my notes from the conversation this morning between you, me and Debbie regarding your meeting yesterday at 10:00am with Biotherm: You met the Sr. VP of Marketing at Biotherm, whom you and Victoria had met about 1-1/2 years ago. Victoria arrived on time and contributed to the meeting in her usual way. She appeared to be ok and was not sick. She left the meeting early because she said she had to go uptown to an appointment. She pretty much seemed herself at the meeting. There was nothing physically wrong with her that was apparent. She showed no signs of being sick. She talked about the magazine and added a few comments to your presentation. She did not seem incoherent."

92.     On December 10, 2006, Vince Frezzo responded to Hamilton's above email, by emailing to Interview President, Sandy Brant, David Hamilton, and DEBORAH BLASUCCI with a "cc" to Human Resources director Marie Mascaro.

93.     Frezzo confirmed his view of the impropriety of this request in an email stating;

> "This is the first time I have received such a follow-up memo regarding a meeting with Victoria Fuller, the AP of Interview magazine. As per our conversation I met with the client along with Victoria Fuller at Biotherm's offices. In a subsequent meeting between David Hamilton and DEBORAH BLASUCCI; (sic) I confirmed the meeting. At this point I was asked by David and Debbie if Victoria looked sick. I said she did not appear sick but this is a question that should be directed to Victoria as I don't know how she actually felt. I asked if there was something they were trying to communicate regarding her health. Both David and Debbie said no and not to worry.

You can imagine my surprise to get such a follow-up memo; again asking the health of an employee of Interview. In my experience of managing at Fortune 100 companies; I have found a question regarding someone's health in the organization to be an HR and legal matter. You can understand the ethics regarding such a matter.

I look for guidance from Sandy Brant or HR regarding the company's policy on how any of these questions should be handled in the future.

Respectfully, Vince Frezzo"
[BRANT ARB HC 001705]

94.    Because Vince Frezzo detected that the inquiry about Plaintiff, Victoria Fuller's health was improperly motivated, Defendants falsely sought to claim that they were confirming that the client meeting on Friday was without incident.

95.    On December 11, 2006 at 11:51 a.m., Marie Mascaro, Interview's head of Human Resources, emailed Vince Frezzo stating, "Dear Vince, It is our policy not to reveal or discuss any confidential medical information. Without disclosing any such information, we needed to confirm that the client meeting on Friday was without incident. Thank you for your concern. Marie Mascaro." [BRANT ARB HC 1704-1705]

96.    Similarly, later that day, December 11, 2006, at 2:18 p.m., David Hamilton emailed Vince Frezzo stating, "[t]he original conversation that DEBORAH BLASUCCI and I had with you on Friday morning was in response to Debbie's concern about Victoria's well-being and her concern that the meeting on Thursday with Biotherm went without incident." [BRANT ARB HC 001840].

97.     The excuses that were provided in both emails that Interview needed to confirm that the meeting with Biotherm went "without incident" were false. Vince Frezzo had already advised BLASUCCI and Hamilton orally of that fact. Moreover, the confirming email sought to portray information about the appearance of Plaintiff's health. In addition, it was not Interview's practice to confirm in writing that a meeting went "without incident."

98.     Defendants used the above false excuse as a pretext to cover up the reasons for BLASUCCI and Hamilton's inquiries into Plaintiff's health, and the attempt to confirm same in the Hamilton email to Frezzo.

99.     Defendants knew the purpose of the inquiry by BLASUCCI and Hamilton was to attempt to use any information against Plaintiff Fuller, rather than to "confirm that the client meeting on Friday was without incident."

100.     Defendants had no reason to believe that "[it was Interview's policy not to reveal or discuss any confidential medical information" because Interview had no such policy. Had that been the "policy," Hamilton should not have been permitted to inquire about and discuss Fuller's health at the outset.

101.     These efforts attempted to, and did, discriminate and retaliate against Plaintiff, *inter alia,* for taking an FMLA medically required leave and based on her disability.

102.     Defendants used the occasion of Plaintiff's medical disability to isolate her, to take various adverse employment actions, to impose a hostile environment against Plaintiff to otherwise exploit Plaintiff's condition, absence and disability leave in violation of Plaintiff's rights.

103.     On or about December 11, 2006, Plaintiff's then attorney, Wendy Lazar, wrote Defendants and complained of the hostile and wrongful treatment of Plaintiff, including isolating Plaintiff from her staff and clients.

104.     Defendants failed to correct their wrongful, hostile and discriminatory actions toward Plaintiff or to make reasonable accommodations to Plaintiff's condition. On the contrary, their adverse actions increased and became worse.

105.     On, or about, December 14, 2006, Plaintiff submitted to the Defendants completed STD benefits claim documents, receipt and sufficiency of which was duly acknowledged by Defendants in writing.

106.     On, or about, January 1, 2007, Defendants, in violation of the terms governing Plaintiff's employment, unilaterally and without prior notice, ceased paying Plaintiff the full compensation that was due and owing, including Plaintiff's substantial commission.

107.     Plaintiff inquired why Defendants stopped paying her contractually owed commission which was part of Plaintiff's compensation package.

108.     Defendants claimed that they withheld commission payments pursuant to the Employment Agreement, however the Employment Agreement contained no such provision.

109.     Defendants' refusal to pay Plaintiff's full compensation was wrongful, intentional, discriminatory and retaliatory.

110.     On, or about, January 2, 2007, following the reexamination of Plaintiff's medical condition, Dr. Clements instructed Fuller to remain on medical leave

until February 1, 2007, subject to his further evaluation of Plaintiff's health at the end of January 2007.

111.     On, or about, January 9, 2007, Plaintiff submitted revised STD benefits claim documents to Defendants, informing Defendants of the change in the Plaintiff's expected return to work date.

112.     Receipt of said revised STD benefits claim documents was duly acknowledged by Defendants in writing.

113.     Defendants never challenged the authenticity, accuracy or sufficiency of such revised STD benefits claims documents at any time while Plaintiff was employed at Interview.

114.     On or about January 25, 2007, following the reexamination of Plaintiff's health condition, Dr. Clements instructed Fuller to remain on medical leave until March 12, 2007, subject to his further evaluation of Plaintiff's health in February 2007.

115.     Corresponding certification by Dr. Clements was provided to Defendants.

116.     On, or about, February 8, 2007, following the reexamination of Plaintiff's medical condition, Dr. Clements informed Plaintiff that her health condition was improving and she would be able to resume normal work on March 2, 2007.

117.     Corresponding certification was provided by Dr. Clements on revised STD benefits claim documents, which were provided to Defendants the following day, February 9, 2007.

118.    Receipt of the aforementioned said revised STD benefits claim documents was duly acknowledged by Defendants in writing.

119.    Defendants never challenged the authenticity, accuracy or sufficiency of the aforementioned revised STD benefits claims documents at any time while Plaintiff was employed at Interview.

120.    In early February 2007, Dr. Clements became concerned with another serious health condition of Plaintiff, unrelated to previously diagnosed gastroenteritis, for which the patient had consulted with Dr. Christina Kwon, M.D. ("Dr. Kwon"). Following a series of tests, Dr. Kwon diagnosed Plaintiff with perineorrhaphy - a progressively debilitating medical condition that necessitated surgical intervention. Despite Dr. Kwon's concerns with the Plaintiff's deteriorating medical condition, she was unable to schedule Fuller for surgery until May of 2007.

121.    In February 2007, Plaintiff commenced an arbitration claim against Defendants for their wrongful actions against her, including but not limited to Defendants' breach of contract and wrongful denial of her job, with all its authority, compensation, perquisites and benefits.

**B.  _Plaintiff's Return to Work After the First Medical Leave – Defendants' Charade That Plaintiff Was Still Associate Editor_**

122.    Plaintiff's medical leave of absence ended on March 1, 2007 and she promptly returned to work at the Defendants' place of business on the morning of March 2, 2007.

123.    On March 2, 2007, Plaintiff found that she was unable to gain entry to her office because the locks to her office door had been changed by Defendants.

Subsequently, Plaintiff also found that access to her office computer had been blocked by Defendants.

124.    On March 2, 2007, Plaintiff, Victoria Fuller, was apparently the only person in defendants' office who did not know that David Hamilton had in every way but officially been given Plaintiff's job and that upon Plaintiff's return to the office, Defendants instructed their staff to act in front of Victoria Fuller "as if it were business as usual."

125.    In fact, Defendants had instructed their staff that Plaintiff, Victoria Fuller was no longer going to be working at Interview, that she was not going to be Associate Publisher, and encouraged what Plaintiff thought was her staff, to ignore everything Plaintiff did or said upon her return to work. [BRANT ARB 25016]

126.    When Plaintiff returned to work on March 2, 2007, the only person who had not been told that defendants were terminating Plaintiff, was Plaintiff herself. [BRANT ARB 25016]

127.    After having changed the locks on Plaintiff's office door and keeping her waiting for hours in the reception, Plaintiff's former administrative assistant, Adrien Bellezza, explained in an email to a friend, "**[t]hen they let her back in the office for like another three weeks and told us business as usual, act like she still is the AP!**" [BRANT ARB 02515, emphasis supplied; *see gen'ly* BRANT ARB 25015-25020.] Bellezza emailed another friend, "How about Victoria. She no longer works here. If you haven't heard. She went on sick leave, before they could lay her off. They even changed the locks on her office door. But then one day randomly showed up at the office

like nothing ever changed. It was maddddnessss. So they finally suspended her..."
Bellezza email, May 25, 2007, BRANT ARB 25020, Pl. Ex. "L."

128.    On Monday, March 5, 2007, days after Plaintiff returned to work,
defendant DEBORAH BLASUCCI wrote Plaintiff and email stating, "[t]he filing [of an
arbitration against us] also accuses us of initiating 'an intentional campaign to undermine
and sabotage' you in carrying out your job responsibilities, usurp your authority and
marginalize your role, with the intention to force you to resign, etc. Nothing could be
further from the truth!" [P 0096-98]

129.    Bellezza's emails confirm that Blasucci and defendants had done
precisely what Plaintiff had accused defendants of, undermining her role as Associate
Publisher and attempting to force Plaintiff to quit.

130.    Defendants spread injurious, false and scandalous rumors about
Plaintiff, VICTORIA FULLER. [BRANT ARB 25015-25020]

131.    Defendants destroyed evidence favorable to Plaintiff.

132.    Defendants engaged in a massive cover-up, destroying evidence
favorable to Plaintiff.

133.    In an effort to destroy evidence favorable to Plaintiff in violation
of her rights, just two days after Defendants terminated Plaintiff, David Hamilton, who
had already effectively taken over Plaintiff's job as Associate Publisher, did, in fact,
"clean up email [about Victoria Fuller]." [BRANT ARB 25175]

134.    On March 2, 2007, upon Plaintiff's return to work, rather than
being permitted to enter her office, Plaintiff was humiliated and forced to wait in the
reception area for hours and treated disrespectfully by subordinates.

135.    Plaintiff was unaware, though it was common knowledge in the office, that when she began her medical leave on December 7, 2006, Defendants immediately changed the lock on Plaintiff's office door.  Adrien Bellezza emailed a friend stating, "[s] o did you hear how VF walked back into the office like nothing happened, and then tried to get into her office but couldnt! [sic] **Because they changed the locks on her office door the day she left**." [*see* BRANT ARB 25016, emphasis supplied]

136.    Plaintiff, Victoria Fuller, was humiliated as company interns and employees looked at her with surprise and shock as they saw her, a highly ranked executive, sitting in the reception area with visitors and job applicants.

137.    Upon her return to work, Plaintiff found that during the period of her medical leave of absence, the long established business practices governing the day-to-day work of Plaintiff's direct subordinates had been countermanded by Defendants, thereby undermining and sabotaging Plaintiff's authority and her ability to carry out her job responsibilities in accordance with the terms governing her employment.

138.    On or about March 5, 2007, Defendant BLASUCCI demanded that Plaintiff produce a fitness-for-duty certification despite the fact that Defendants were in receipt of prior writings from Plaintiff's physician attesting to her need for medical leave and that she would be fit to return to work on March 2, 2007.

139.    The following day, March 6, 2007, at Plaintiff's request, Dr. Clements wrote an additional fitness-for-duty certification and faxed it to Plaintiff at Interview. The document's facsimile was not sufficiently legible, requiring Plaintiff to visit her physician's office to personally obtain the original of the fitness-for-duty

certification document, which was delivered by Plaintiff to Defendants on March 15, 2007.

140.   Plaintiff complained of her treatment to defendants.

141.   In response to Plaintiff's protest of her treatment, Defendant BLASUCCI emailed Plaintiff on March 9, 2007, stating, "[n]o one at Brant is preventing you from working or undermining you."

   **C.   Defendants' Commenced "Investigation" of Plaintiff's 2005-2006 Expenses Only After Plaintiff Returned to Work from Leave in March 2007 And Never Inquired of Plaintiff About Those Expenses**

142.   Defendants actually desired to terminate Plaintiff at or about the time of Plaintiff's first medical disability leave of absence.

143.   Defendants believed that their hostile and abusive action toward Plaintiff while on leave and upon her return would cause Plaintiff to resign.

144.   If Plaintiff resigned, Defendants would not have been required to pay Plaintiff any severance pay under the Employment Agreement.

145.   When Plaintiff returned to work on March 2, 2007, Defendants continued to treat Plaintiff in a hostile way in an effort to obtain Plaintiff's resignation.

146.   If Plaintiff, Victoria Fuller, were terminated "without cause," Plaintiff's employer would have been obligated to pay plaintiff severance pay to Plaintiff pursuant to § 6.4 of the Employment Agreement as amended, providing for "one month's severance pay for every year that the Employee has been in the hire of the Employer."

147.   As of March 2007, Plaintiff had been in the employ of Interview, Inc., for some 13 years.

148.    If Plaintiff's employment were terminated by her employer "without cause," at that time, Interview, Inc., would have owed Plaintiff some $356,015.89 in severance pay.

149.    If Plaintiff's employment were justifiably terminated "for cause," her employer would not owe Plaintiff any severance pay pursuant to § 6.1 of the Employment Agreement.

150.    Because Plaintiff did not resign, after Plaintiff returned to work from her medical leave on March 2, 2010, Defendants viewed that they needed to resort to some other method to avoid paying the some $356,015.89 in severance pay.

151.    Defendants decided to fabricate grounds for terminating Plaintiff "for cause," in order to avoid the contractual obligation of paying some $356,015.89 in severance for a "without cause" termination.

152.    After Plaintiff returned from work on March 2, 2007, Defendants encouraged and guided their employees and former employees to make false and exaggerated claims against Plaintiff, including such false claims that Plaintiff had submitted fraudulent expense reports.

153.    Plaintiff did not submit fraudulent expense reports.

154.    BLASUCCI began her "investigation" of Plaintiff by meeting with Fuller's former administrative assistant, Joshua Homer on March 7, 2007.

155.    On or about March 15, 2007, DEBORAH BLASUCCI met with Fuller's former administrative assistant, Adrien Bellezza.

156.    On or about March 15, 2007, DEBORAH BLASUCCI met with Fuller's former administrative assistant, Marie LaFrance.

157.    The above meetings with former assistants Homer, Bellezza and LaFrance, were for the purpose of obtaining information and/or statements that would form a ground for discharging Plaintiff "for cause."

158.    Plaintiff's former administrative assistants Homer, Bellezza and LaFrance had prepared and submitted the Plaintiff's expense reports in the course of their jobs working for Plaintiff.

159.    If, in fact, Homer, Bellezza and LaFrance were aware that Plaintiff was submitting fraudulent expense reports, they too would have been responsible for perpetrating frauds upon Defendants by preparing and submitting such allegedly fraudulent reports.

160.    Defendants encouraged these assistants and former assistants of Plaintiff to make incriminating statements and claims about Plaintiff without regard to the truth.

161.    After LaFrance made incriminating statements against Plaintiff, Defendants promoted Marie LaFrance.

162.    Defendants rehired Joshua Homer after he provided a statement and/or information incriminating Plaintiff.

163.    Defendant's never would have promoted and rehired Plaintiff's former administrative assistants if they actually believed that these former assistants participated in knowingly preparing fraudulent expense reports and submitting them to Defendants.

164.    Defendants then hired William Murray of the accounting firm of Anchin, Murray and Anchin, LLP, who met with DEBORAH BLASUCCI on March 19,

2007 to assist Defendants in connection with their allegations that Plaintiff submitted false expense reports.

165.    William Murray never provided any expert opinion that opined that Plaintiff had committed any fraud in submitting her expense requests to her employer.

### D.  Plaintiff's Second Medical Leave

166.    On, or about, March 9, 2007, Dr. Kwon, in consultation with Dr. Clements, determined that due to Plaintiff's deteriorating medical condition, unrelated to Plaintiff's other medical conditions for which she took her first medical leave, it was medically advisable for Plaintiff to promptly undergo a corrective surgical procedure.

167.    On, or about March 12, 2007, Plaintiff informed Defendants about her need for a second medical leave, delivering in person to Interview's Human Resources Director, Marie Mascaro, a written document from Plaintiff's physician, indicating that she would be undergoing the required surgical procedure on March 26, 2007.

168.    On, or about, March 26, 2007, Plaintiff underwent the surgical procedure, performed by Dr. Kwon, and was discharged from the hospital on March 28, 2007.

### E.  Defendants Terminated Plaintiff Without Disclosing Factual Bases - Plaintiff Learns One Year Later Through Federal Discovery She Was Discharged for Claims of "Fraud, Theft and Submission of "Fabricated Expense Reports"

169.    On, or about, March 14, 2007, Plaintiff was handed by Mascaro a letter authored by BLASUCCI and dated March 14, 2007, informing Plaintiff that she was being suspended without pay, pending investigation by Defendants into alleged illegal and unethical conduct engaged by Plaintiff in her capacity as Vice President/Associate Publisher ("Suspension Letter").

170.    The March 14, 2007 Suspension Letter never identified the basis for the Defendants' allegations nor alleged any specific facts.

171.    BLASUCCI's March 14, 2007 suspension letter to Plaintiff stated, "[w]e regret to inform you that in the last several weeks we have received evidence that you have engaged in certain illegal and unethical conduct in your capacity as Vice President/Associate Publisher. We have been investigating these matters and are greatly concerned. Therefore, effective immediately, you are suspended without pay while our investigation continues."

172.    On, or about, March 27, 2007, just one day after her surgery, Plaintiff received, via courier at her residence, a letter authored by Sandra Brant, dated March 27, 2007, informing Plaintiff that: "… we have now concluded our investigation referenced in DEBORAH BLASUCCI's letter suspending you on March 13th [sic]. Effective immediately, your employment is hereby terminated for Cause in accordance with Section 6.1 of the Employment Agreement between you and Interview, Inc. dated August 15, 2002. Cause includes, but is not limited to, your violations of Sections 6.1(a) and (d)… All employee benefits are canceled effective immediately …" ("Termination Letter").

173.    The Termination Letter never identified what Defendants claimed Plaintiff did to cause them to terminate Plaintiff's employment "for cause."

174.    At no time prior to the middle of 2008, in response to Plaintiff's specific Interrogatories in this instant federal action, did Defendants ever reveal to Plaintiff that the claim that she had been terminated for "submitting falsified and fabricated expense reports in 2005 and 2006..." [*see*, *e.g.,* Defendants' Amended Objections and Responses to Plaintiff's Interrogatories, Response No. 2, dated June 6, 2008].

175.    At no time before Plaintiff returned to work on March 2, 2007 from her first disability leave, had Defendant conducted any investigation of allegations of Plaintiff's "acts of material fraud, theft and material dishonesty."

176.    On or about March 7, 2007, Defendant began its investigation of Plaintiff's alleged "acts of material fraud, theft and material dishonesty." [*see*, Interrogatory Response No. 3].

177.    At no time prior to commencement of Plaintiff's medical leaves did the Defendants serve upon Plaintiff any notices pursuant to the terms of the Employment Agreement.

178.    At no time prior to commencement of Plaintiff's medical leaves did the Defendants provide Plaintiff notice of any alleged deficiencies nor provide Plaintiff with adequate time to cure any alleged cause for adverse employment action by Defendants against Plaintiff pursuant to the Employment Agreement.

179.    Plaintiff was unlawfully suspended and then summarily terminated from her employment, *inter alia*, because of her medical disability and for seeking reasonable accommodations for medical leaves associated with her disability.

180.    Defendants retaliated against Plaintiff.

181.    Defendants terminated Plaintiff "for cause," in whole or in part, in order to save the company some $356,015.89 in severance pay as obligated pursuant to her contract.

182.    Interview, Inc., had the right to terminate Plaintiff's employment "without cause" pursuant to Section 6.4 of their Employment Agreement, as amended.

183.    If Defendants terminated Plaintiff's Employment Agreement without cause, Interview, Inc., would be obligated to pay Plaintiff some $356,015.89 in severance pay.

184.    At and about the second half of 2006, defendant Interview, Inc., was operating at a loss.

185.    At and about the second half of 2006, defendant Interview, Inc.'s revenues had declined.

186.    Prior to and at the time that Plaintiff was suspended and terminated, Interview, Inc., was attempting to cut costs and reduce the loss and/or increase the profitability of the company.

187.    In order to avoid paying Plaintiff any severance pay, Defendants claimed that Plaintiff was being discharged "for cause" pursuant to Section 6.1(a) of her Employment Agreement dated August 15, 2002, as amended.

188.    Defendants fabricated claims that Plaintiff committed numerous criminal acts in that she "engaged in acts of material fraud, theft and material dishonesty in violation [her Employment Contract]...by engaging in a pattern of submitting falsified and fabricated expense reports in 2005 and 2006."

189.    After Plaintiff returned to work on March 2, 2007, Defendants encouraged and requested former assistants to Plaintiff to provide false and exaggerated information against Plaintiff, inciting staff and former staff to make false and dubious claims that Plaintiff submitted false expense reports and committed other wrongful acts.

190.    Defendants spread and caused to be spread, false information relating to Plaintiff and her reason for termination.

191.    After 13 years of loyal service as a trusted and valuable executive, Defendants maliciously attempted to make Plaintiff's work situation `so miserable that she would quit, and when Plaintiff did not, they concocted false charges against her to avoid paying the severance that was due her based on their contract.

192.    Defendants proffered such false allegations as part of a discriminatory and retaliatory pretext to claim that Plaintiff breached her employment contract so Defendants could terminate Plaintiff.

193.    Defendants conducted a so-called investigation of Plaintiff's acts and expenses where it never so investigated other persons before.

194.    Defendants conducted a so-called investigation of Plaintiff's acts and expenses where it never so investigated other persons who were not disabled or did not request or take medical leave.

195.    Defendants knowingly used incomplete, dubious and false information in their "investigation."

196.    Plaintiff, and those who were involved in preparing Plaintiff's expense reports, properly submitted those reports which were contemporaneously approved by Brant and Interview without dispute.

197.    The procedure that Defendant BLASUCCI established in her capacity as CFO, for resolving erroneous or disputed expense reports, was to return the report to the employee for revision and resubmission of the expense report by that employee.

198.    Defendants never contemporaneously rejected, returned nor disputed Plaintiff's expense reports during the entire time of her employ at Interview Magazine.

199.    Defendants never rejected, returned nor disputed Plaintiff's expense reports during the entire time of her employ at Interview Magazine.

200.    BLASUCCI personally approved of all of Plaintiff's expense report payments and never rejected nor returned for resubmission any of Plaintiff's expense reports.

201.    Interview and BLASUCCI regularly returned erroneous expense reports to other employees because of questionable submitted expenses.

202.    It was not until the discovery process in this lawsuit as a result of Plaintiff's Interrogatories to Defendants, that Defendants first advised Plaintiff of their claim that Plaintiff's expense reports were false or fraudulent in any way by way of Interrogatory Responses on May 5, 2008 and June 6, 2008.

203.    Defendants never contemporaneously provided Plaintiff the opportunity to either explain the contents of her expense reports or modify same at any time, up to and including the time of her termination.

204.    After Defendant's so-called investigation, when Defendants claim to have learned of Plaintiff's fraudulent or erroneous expense report submission, Defendants never inquired at any time of Plaintiff the reason or explanation for any of the allegedly questionable or fraudulent expense requests.

205.    At no time during Plaintiff's employment at Interview, Inc., did Defendants advise Plaintiff, Victoria Fuller, that they had any issue, claim, qualm or dispute with any of Plaintiff's submitted expenses, including the expenses for which she was terminated.

206.    At no time during Plaintiff's employment did Defendant inquire or give Plaintiff the opportunity to explain or justify any of the submitted expenses which Defendant later would claim formed the basis for Plaintiff's termination.

207.    Other employees, managers and executives of Interview and Brant Publications regularly charged or claimed a variety of expenses as business expenses which are now being claimed to constitute "personal" expenses in connection with Victoria Fuller.

208.    Numerous "personal" expenses were routinely approved or not disputed when submitted by certain other employees, managers and officers.

209.    The standards for reimbursement of expenses applied by defendants in claiming that plaintiff's expense reports were fraudulent, were different from standards used for other of defendants' executives and employees.

210.    The standards for record keeping, documentation and explanation for reimbursement of expenses applied by defendants in claiming that plaintiff's expense reports were fraudulent were different from standards used for other of defendants' executives and employees.

211.    Defendants now claim that allegedly "personal" expenses of Plaintiff that were routinely acceptable expenses for others, form the basis, in whole or in part, for Plaintiff's termination.

212.    The amounts defendants claim that plaintiff submitted fraudulent expense reports total in the several hundreds of dollars over a two year period, 2005 and 2006, and are comprised largely of allegations that plaintiff took taxis, which costs ranged approximately $10 to $25 each.

213.    Plaintiff's annual compensation was approximately $325,000 annually.

214.    Plaintiff was responsible for approximately $17 million in revenue annually.

215.    Plaintiff, at her own initiative and not at the request of any officer, manager or employee of Interview or Brant, regularly reimbursed her employer by check, amounts she charged to her employer for her own personal use, such as for her personal use of messenger services.

216.    Other employees, managers and executives regularly charged non-business and personal items to Interview and/or Brant and were not subject to any discipline.

217.    Defendants wrongfully terminated Plaintiff's employment contract and falsely claimed that Plaintiff stole or embezzled company funds.

218.    All of Plaintiff's expense reports and submitted expenses were contemporaneously checked by Interview or Brant accounting staff.

219.    Defendants discriminated against Plaintiff because of her disability, the perception of her disability, medical leaves, and retaliated against her for seeking reasonable accommodation for her disabilities and attempts to enforce her rights, by, among other things: (a) refusing to pay Plaintiff's full compensation to which she was lawfully entitled pursuant to the terms of the Employment Agreement and company policies; (b) an intentional campaign designed to isolate, undermine and sabotage Plaintiff in her position as Vice President and Associate Publisher and in carrying out her job responsibilities; and (c) suborning Plaintiff's authority and marginalizing her management role, in an effort to force her from her employment prior to her unlawful termination by Defendants.

220.    Defendants created a hostile work environment, wrongfully terminated Plaintiff, deprived her of a promotion for which she was uniquely qualified to the Publisher position at Interview magazine, and otherwise discriminated and retaliated against Plaintiff.

221.    Upon information and belief, Defendants knew, or should have known, that their actions were unlawful and violated Plaintiff's rights under 29 U.S.C. §§ 2601 *et. seq.*, New York State Executive Law § 296, *et. seq.* and the New York City Administrative Code § 8-502(a), *et. seq.*

222.    Defendants willfully and knowingly conspired, aided and abetted to discriminate and retaliate against Plaintiff and to deprive Plaintiff of her civil rights.

223.    Upon information and belief, Defendants acted maliciously and/or in reckless disregard to Plaintiff's protected civil rights.

224.    As Vice President and Associate Publisher of Interview Magazine, Plaintiff was in a position of responsibility and performed satisfactorily, the tasks normally performed by a publisher of a magazine.

225.    Sandra Brant had an agreement with Peter Brant and/or Brant Publications, Inc., for the job of Publisher.

226.    Plaintiff could not have risen to the position of Publisher of Interview Magazine because as long as Defendant Sandra Brant had an ownership interest in Brant, Sandra Brant's contract provided for her to be Publisher.

227.    Upon the termination and departure of Sandra Brant from Brant and Interview Magazine when her interests were bought by Peter Brant and/or companies he owned in 2009, Plaintiff, Victoria Fuller would have risen to the position of Publisher of Interview Magazine, but for Defendants wrongful, discriminatory and/or retaliatory actions.

228.    Among the reasons for the decline in revenues of Interview when plaintiff worked at Interview, was the poor management at the highest levels and lack of attention to business and market trends by management.

229.    With Peter Brant's acquisition of Sandra Brant's ownership interest in Brant Publications, Inc., and the removal of Sandra Brant as Publisher and Ingrid Sischy as Editor-In-Chief, Interview, Inc., went into a managerial and financial tailspin,

with a parade of changing top managers and a lack of stable leadership able to carry out

an effective business plan for the magazine.

230.    As Publisher of Interview, Plaintiff would have been able to

provide stability, knowledge of the magazine in all business phases, effective leadership

and direction and the necessary tools to address the business and market trends.

231.    As a result Interview, Inc., and Brant Publications, Inc., would not

have suffered the precipitous declines they did with the departure of Sandra Brant and

Ingrid Sischy and would have been piloted toward a successful future and place in the

market.

232.    As Publisher, Plaintiff's income would have increased

significantly.

233.    Plaintiff has suffered extraordinary emotional distress and

psychological damages as a consequence of Defendants' actions, including isolating her

from her coworkers at Interview, intentionally alienating her subordinates from her, by

spreading false information about Plaintiff including accusing her of embezzlement

and/or theft of company funds, by wrongfully withholding pay and commissions from

Plaintiff, by humiliating her in her work situation and by otherwise acting in a hostile,

discriminatory and retaliatory manner.

234.    As a consequence of Defendants actions, Plaintiff was caused to

suffer and be treated for serious emotional injuries, including, but not limited to anxiety,

depression and Post-Traumatic Stress Disorder, and was caused to suffer an exacerbation

of pre-existing conditions.

235.    As a consequence of defendants' actions which were so severe and harmful, Plaintiff was compelled for the first time in her life to take psychotropic prescription medications.

## FIRST CAUSE OF ACTION: FMLA

236.    Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as if fully set forth herein.

237.    Defendants failed to reasonably accommodate Plaintiff's disability, interfered with Plaintiff's attempts to exercise her rights under FMLA, Plaintiff's FMLA leave, interfered with Plaintiff' FMLA rights, otherwise discriminated and retaliated against Plaintiff in the terms and conditions of her employment because of her disability and because of her requests and taking of family medical leave and failed to leave her job open and available for her in violation of the Family Medical Leave Act ("FMLA") of 1993. 29 U.S.C. §§ 2601 *et. seq*.

238.    Defendants interfered with Plaintiff's rights to take an FMLA medical leave but also significantly interfered with Plaintiff's right to return to her job after her first FMLA leave.

239.    The right to take an FMLA leave is virtually illusory without the right to return to the same job following such leave.

240.    Defendants otherwise discriminated and retaliated against Plaintiff in violation of the FMLA.

241.    Defendants used Plaintiff's absences while on leave to undermine her authority and to conspire to discriminate, retaliate, suspend and terminate Plaintiff.

242.     As a result, Plaintiff suffered damages for lost past and future earnings as limited pursuant to the FMLA, liquidated damages pursuant to the FMLA and other employment benefits, of TWO MILLION ($2,000,000) DOLLARS, plus costs, attorneys' fees and disbursements in connection with this case.

## SECOND CAUSE OF ACTION:
## NEW YORK STATE HUMAN RIGHTS LAW

243.     Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as if fully set forth herein.

244.     Defendants failed to reasonably accommodate Plaintiff's disability, imposed a hostile work environment, discriminated and retaliated against Plaintiff in the terms and conditions of her employment because of her disability and leave, and otherwise discriminated and retaliated against Plaintiff in violation of the New York State Human Rights Law, Executive Law § 290, *et. seq*.

245.     As a result of such discrimination and retaliation, Plaintiff suffered damages for lost past and future earnings, other employment benefits, and emotional injuries and other compensatory damages in an amount of TEN MILLION ($10,000,000) DOLLARS.

## THIRD CAUSE OF ACTION: NEW YORK CITY HUMAN RIGHTS LAW

246.     Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as if fully set forth herein.

*247.*     Defendants failed to reasonably accommodate Plaintiff's disability, and imposed a hostile work environment, discriminated and retaliated against Plaintiff in

the terms and conditions of her employment because of her disability and leave, and

otherwise discriminated and retaliated based on disability and the perception of disability

in violation of the New York City Administrative Code § 8-502(a), *et. seq.*

       248.    As a result of such discrimination and retaliation, Plaintiff suffered

damages for lost past and future earnings, other employment benefits, and emotional

injuries and other compensatory damages in the amount of TEN MILLION

($10,000,000) DOLLARS.

       249.    As a result of Defendants' willful and/or reckless disregard for the

protected rights of Plaintiff, and based on the respective wealth of the Defendants and the

amounts appropriate to punish and deter them from such future wrongful acts, Plaintiff

should be awarded punitive damages in the amount of TWENTY-FIVE MILLION

($25,000,000) DOLLARS.

### FOURTH CAUSE OF ACTION: PRIMA FACIE TORT

       250.    Plaintiff repeats and re-alleges each and every allegation contained

above with the same force and effect as if fully set forth herein.

       251.    Defendants intentionally inflicted harm upon Plaintiff, without

excuse or justification, through acts that would otherwise be lawful.

       252.    As a result of Defendants actions, Plaintiff suffered special

damages, including but not limited to the past and future loss of wages, loss of

commissions, including the losses that caused the damage to her reputation and good

name, including, but not limited to the inability to receive an appropriate references from

Defendants as her employer of 13 years, effectively creating a inexplicable gap in her

resume and employment history, injuring her ability to obtain work at her appropriate level on an ongoing basis into the future.

253.   Plaintiff special damages include the lost increase for the failure to be promoted to Publisher at the time of the departure of Sandra Brant as Publisher.

254.   As a result of Defendants actions, Plaintiff further suffered special damages loss of the compensation she would have earned had she been appointed Publisher of Interview Magazine, a job Plaintiff was certainly qualified to perform.

255.   Plaintiff would have been the likely choice for Publisher certainly at the point that her former subordinate, David Hamilton, whom Plaintiff hired with no advertising sales experience and trained, was eventually promoted, by default, to the position of Publisher of Interview Magazine after Peter Brant had either fired or had other Interview Publishers resign or decline the position.

256.   As a result, Plaintiff suffered compensatory damages in an amount of TEN MILLION ($10,000,000) DOLLARS.

257.   As a result of Defendants' willful and/or reckless disregard for the protected rights of Plaintiff, and based on the respective wealth of the Defendants and the amounts appropriate to punish and deter them from such future wrongful acts, Plaintiff should be awarded punitive damages in the amount of TWENTY-FIVE MILLION ($25,000,000) DOLLARS.


**FIFTH CAUSE OF ACTION:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

258.   Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as if fully set forth herein.

259.     Defendants, by extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff.

260.     Defendants extreme and outrageous conduct included, but was not limited to fabricating claims that Plaintiff, a valued member of upper management employed in good standing for some 13 years, engaged in acts of fraud and theft and other acts constituting crimes, humiliated Plaintiff in front of those over whom she had direct supervisory authority, intentionally isolated Plaintiff from her fellow employees and clients by directing her and her co-employees not to contact each other, using the enforced isolation to create and fabricate false claims against Plaintiff, and other intentionally outrageous, humiliating and intentionally injurious acts.

261.     Plaintiff suffered serious emotional injuries including, but not limited to, Post-Traumatic Stress Disorder.

262.     As a result, Plaintiff suffered compensatory damages in an amount of TEN MILLION ($10,000,000) DOLLARS.

263.     As a result of Defendants' willful and/or reckless disregard for the protected rights of Plaintiff, and based on the respective wealth of the Defendants and the amounts appropriate to punish and deter them from such future wrongful acts, Plaintiff should be awarded punitive damages in the amount of TWENTY-FIVE MILLION ($25,000,000) DOLLARS.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a)   On the First Cause of Action pursuant to FMLA for damages in the amount of TWO MILLION ($2,000,000) DOLLARS, plus attorneys' costs and fees, including but not limited to:

i)   actual damages, pursuant to 29 U.S.C. § 2617(a)(1)(A)(i)(I);

ii)  statutory liquidated damages, pursuant to 29 U.S.C. § 2617(a)(iii); PLUS,

iii) statutory attorney fees, pursuant to 29 U.S.C. § 2617(a)(3);

b) On the Second Cause of Action pursuant to the New York State Human Rights Law for damages in the amount of TEN MILLION ($10,000,000) DOLLARS;

c) On the Third Cause of Action pursuant to the New York City Human Rights Law for actual damages in the amount of TEN MILLION ($10,000,000) DOLLARS, and punitive damages in the amount of TWENTY-FIVE MILLION ($25,000,000) DOLLARS and attorneys' fees pursuant to New York City Administrative Code § 8-502(a), *et. seq.*;

d) On the Fourth Cause of Action for Prima Facie Tort, for actual damages in the amount of TEN MILLION ($10,000,000) DOLLARS, and punitive damages in the amount of TWENTY-FIVE MILLION ($25,000,000) DOLLARS;

e) On the Fifth Cause of Action for Intentional Infliction of Emotional Distress for actual damages in the amount of TEN MILLION ($10,000,000) DOLLARS, and punitive damages in the amount of TWENTY-FIVE MILLION ($25,000,000) DOLLARS;

f) Attorney fees, disbursements and other costs and interest where permitted by law; and

g) For such other relief which the Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated this 20th day of July, 2010
Brooklyn, New York

Alan J. Rich, Esq. [AR-4701]
Law Offices of Alan J. Rich, LLC
26 Court Street, Suite 1801
Brooklyn, New York 11242
Telephone (212) 921-2244
Email: ARich@Richlaw.US