## AMERICAN ARBITRATION ASSOCIATION
## NEW YORK COUNTY, NEW YORK

-------------------------------------------------------x
In the Matter of the Arbitration between

VICTORIA FULLER,

                                       Case No. : 13 116 00418 07

               Claimant,

    -and-                             **PROPOSED AMENDED**
                                       **CLAIM**

INTERVIEW, INC. and
BRANT PUBLICATIONS, INC.,

               Respondents.
-------------------------------------------------------x

     Pursuant to the American Arbitration Association's National Rules for the

Resolution of Employment Disputes, Claimant, Victoria Fuller, by her attorneys,

the Law Offices of Alan J. Rich, LLC, hereby makes the instant Amended Claim,

and alleges as follows:

### PARTIES

1.     The address of Claimant, Victoria Fuller ("claimant" or "Fuller"), is:

                    Victoria Fuller
                    415 Fourth Street, #3
                    Brooklyn NY 11215

     Claimant is represented in this proceeding by her undersigned counsel.

2.     The address and telephone number of Respondents are:

575 Broadway, 5th Fl.
New York, New York 10012
(212) 941-2828

The Respondents are represented by: Peter T. Shapiro, Esq. of:

Lewis Brisbois Bisgaard & Smith LLP
199 Water Street
25th Floor
New York, NY 10038
Tel: (212) 232-1322
Email: pshapiro@lbbslaw.com

## FACTS AND CLAIMS

3.     Claimant, Victoria Fuller, had been continually employed by Interview, Inc. since February 14, 1994 until her termination on March 27, 2007.

4.     At all times relevant to this claim, claimant was Vice-President and Associate Publisher.

5.     At all times relevant to this claim, Fuller performed her job in a satisfactory manner.

6.     Fuller performed in such an exemplary manner during her 13 year tenure at Interview that Interview promoted her four times — from Fashion Manager, to Fashion Director, to Advertising Director, to Associate Publisher and to Vice President Associate Publisher.

7.     No disciplinary actions or other adverse employment actions had ever been taken by the defendants against plaintiff prior to the unlawful actions taken by defendants in December 2006 at or about the time that plaintiff

2

commenced her medical leave.

8.     Fuller was responsible for approximately $17 million in revenue annually and was responsible for managing Interview's advertising, marketing and promotion departments.

9.     During Claimant's tenure at Interview, she was directly and proximately responsible for the expansion of Interview's advertising revenue nearly threefold, by among other things, developing new client accounts in the heretofore underdeveloped sectors of the market and substantially increasing revenue from certain key accounts that plaintiff was responsible for servicing personally.

10.     Respondent Interview, Inc. was and is the publisher of Interview Magazine.

Interview Inc., was and is owned by Respondent Brant Publications, Inc. For purposes of this Claim, Claimant's employer shall be referred to here as "Interview."

11.     Fuller was employed pursuant to an Employment Agreement ("Agreement") dated August 15, 2002, including schedule 1, as amended by further agreements dated August 27, 2003, April 1, 2004, inclusive of revised schedule 3. The Agreement with amendments and schedules are attached hereto at Exhibit A.

12.     Fuller was entitled to compensation pursuant to the Agreement

including a "base salary" and a commission.

13.   The base salary was $200,000 pursuant to ¶ 5.1 of the Agreement.

14.   The Agreement provided that "[i]n addition to the base compensation set forth in Paragraph 5.1, above, the Employee shall receive a commission based on a percentage of net sold advertising sales..."

15.   The amount and calculation of the commission in the Agreement of August 15, 2002, was amended as indicated above.

16.   Claimant's commission for 2006 was $120,215.

17.   Interview Magazine's budget was increased by 7% budget increase for 2007.

18.   Claimant's annual commissions for the year 2007 based on the method of calculation used in the prior year, would have been increased proportionally to $128,630.

19.   On December 7, 2006, Fuller commenced a medical leave due to illness.

20.   Fuller remained out of the office due to her medical condition until March 2, 2007.

21.   During claimant's leave of absence, respondents withheld claimant's contractually owed commission.

22.   Interview paid Fuller her commission only through December 31, 2006.

23.     Interview did not pay Fuller any commission while Fuller was out on medical leave from January 1, 2007 to March 2, 2007 when she returned to work.

24.     Interview did not pay Fuller any commission for the period from her return to work on March 2, 2007 through March 27, 2007, when Fuller was terminated by Interview.

25.     Interview was bound to pay Fuller "100% of normal earnings" while out on her short term medical leave pursuant to the Agreement and company policy, a copy of which policy is attached at Exhibit "B," Interview "Schedule of Salary Continuation Benefits for Full Time Employees."

26.     This was among the benefits afforded to Fuller under law and pursuant to ¶ 5.3 which provides, "[t]he Employee shall receive medical, dental, life and disability insurance and other fringe benefits provided to full-time, non-union employees of the Employer."

27.     On March 14, 2007, respondent sent her a letter stating:

> ...in the last several weeks we have received evidence that you have engaged in certain illegal and unethical conduct in your capacity as Vice President/Associate Publisher. We have been investigating these matters and are greatly concerned. Therefore, effective immediately, you are suspended without pay while our investigation continues.
>         At the conclusion of our investigation, we will determine whether to continue your employment, or to terminate your employment for Cause and take other appropriate actions.
>                 *See* letter attached at Exhibit "C"

5

28.     On March 27, 2007, Interview terminated Fuller. *See* letter attached here at Exhibit "C."

29.     Interview continued to refuse to pay Fuller her commissions from the time Fuller returned to work on March 2, 2007 through March 27, 2007, at which time Interview terminated Fuller.

## BREACH OF CONTRACT:
## FAILURE TO PAY COMMISSIONS

30.     The above withholding and refusal to pay Fuller's commissions from January 1, 2007 to March 27, 2007 breached the Employment Agreement and the policies and procedures of the employer as incorporated into the terms of plaintiff's Employment Agreement.

31.     Interview's failure to pay commissions owed during this 86 day period, at the 2007 annual commission rate of $128,630 is $30,307.

## BREACH OF CONTRACT: WRONGFUL "TERMINATION FOR CAUSE"

32.     On March 27, 2007, Interview terminated Fuller's employment purporting that claimant was, "terminated for Cause in accordance with Section 6.1 of the Employment Agreement between you and Interview. Inc. dated August 15, 2002. Cause includes, but is not limited to your violations of Sections 6.1 (a) and (d)." *See* letter attached here at Exhibit "C."

33.     Section 6.1 (a) provides the right to terminate for cause for, "(a)

embezzlement, theft, larceny, material fraud, or other acts of material
dishonesty."

34.    Section 6.1 (d) provides the right to terminate for cause for, "gross
insubordination or repeated uncorrected insubordination after written warning
by the company's President or other officer of the company..."

35.    At no time did Interview during the course of Fuller's employment,
during the so-called "investigation" period, during the suspension period, nor at
any time in the termination process, did Interview even notify plaintiff of the
claims of her alleged wrongdoing pursuant to ¶ 6.1 (a) nor did anyone ask Fuller
whether she committed any of the wrongful alleged acts.

36.    Interview never asked Fuller a single question about any of the
allegations against her.

37.    Neither the President nor any other officer of the company ever
issued a written warning of insubordination to Fuller.

38.    It was not until May and June of 2008 in response to Plaintiff's
Interrogatories in a federal claim, that Interview first stated that the basis for its
claims of "embezzlement, theft, larceny, material fraud, or other acts of material
dishonesty" were Fuller's allegedly fraudulent expense reports from 2005 and
2006, seeking company reimbursement in the hundreds of dollars for personal
charges, consisting primarily of receipts for taxis and meals.

39.    The claimed source of the allegations of wrongdoing were

individuals who previously worked for Fuller who assembled and submitted Fuller's allegedly fraudulent expense reports.

40.     In effect, the people who were Interview's sources for Fuller's alleged wrongdoing were people who themselves would have committed fraud against the company by submitting the allegedly false reports on Fuller's behalf.

41.     Subsequent to providing this information, some of these individuals were hired back by Interview and/or given promotions and salary increases.

42.     Fuller did not violate Sections 6.1 (a) and (d) of the contract.

43.     Fuller's expenses were routine, proper and within the norms of Fuller's job duties.

44.     Fuller's expenses were appropriate and proper for senior level executives at Interview.

45.     Interview's routine practice when an expense report was believed to have errors or included personal items, whether intentionally or not, was to return the expense report and give the individual the opportunity to remove or explain the questioned items in a resubmitted expense report.

46.     Interview violated its own practice by failing to ever inquire from Fuller's about her expense reports, and to give Fuller the opportunity to correct or resubmit the reports, either contemporaneously when the reports were submitted in 2005 and 2006 or when Interview launched its "investigation" in or about March 2007.

47.     Interview's investigation was launched in or about March 2007, only after Fuller returned to work from her medical leave.

48.     Because of Interview's breach of the Employment Agreement, plaintiff is entitled to the benefits she would be entitled to pursuant to ¶ 6.4 for termination "Without Cause," which provides for severance in the amount of one month per year of employment. Fuller was employed for 13 years and was entitled to 13 months of severance based on a base annual salary rate of $200,000 and the 2007 annual commission in the amount of $128,630.  Thirteen months severance at the above annual salary and commission amounts to $356,016. Fuller was damaged in the above amounts.


## **ADDITIONAL BREACHES**

49.     Interview breached the Employment Agreement with Fuller in other ways, including but not limited to interfering with Fuller's ability to perform her job, by refusing to allow Fuller to carry out any of her job related tasks while on leave, contrary to the customary practice at Interview.

50.     Fuller was forbidden from having contact with Interview employees or from having contact with Interview's clients while out on medical leave contrary to the customary practice at Interview.

51.     Pursuant to contract, Fuller was Vice President/Associate Publisher with all the duties, responsibilities and authority that is incumbent upon such

title. Interview breached the Agreement by undermining Fuller in her job responsibilities, undermining her authority and causing her subordinates to do the same, including by locking Fuller out of her office upon her return to work, disconnecting her computer and other examples of humiliating behavior, intended to undermine Fuller and to cause her to resign.

52.     Respondents' above actions constituted material breaches of the Employment Agreement.

## DAMAGES CLAIMS

53.     Claimant seeks damages in the above amounts for defendants breaches of contract and such other damages as are consistent with the facts and law, that result as a consequence of Respondents' breaches.

54.     Claimant seeks liquidated damages and attorneys' fees pursuant to New York Labor Law § 191 ( c) and 198;

55.     Further, Claimant seeks interest, attorneys' fees, costs and disbursements in the instant claim.

## REQUESTED HEARING LOCATION

56.     Claimant requests that the hearing location be the New York County Offices of the American Arbitration Association or such other location in New York County as may  be mutually agreed to by the parties.

Dated:  New York, New York
        November 6, 2009

                              **Law Offices of Alan J. Rich, LLC**
                              Attorneys for Claimant


                    By:  _____
                         Alan J. Rich
                         26 Court Street
                         Suite 1801
                         Brooklyn, New York 11242
                         Tel: 212-921-2244
                         Email: ARich@Richlaw.US

Exhibit "A"

## EMPLOYMENT AGREEMENT

This Agreement is made as of August 15, 2002, by and between INTERVIEW, INC., of 575 Broadway, 5th Floor, New York, New York 10012 ("Employer"), and VICTORIA FULLER, of 872 Carroll Street, Brooklyn, New York 11215 ("Employee").

WHEREAS, the Employer is engaged in the business of publishing; and

WHEREAS, the Employer desires to retain the services of the Employee in the capacity of its Associate Publisher.

NOW THEREFORE, IT IS AGREED AS FOLLOWS:

Section 1.     Employment.  The Employer agrees to employ the Employee full-time and the Employee agrees to accept the employment described in this Agreement.

Section 2.     Duties.  The Employee shall serve as Associate Publisher of the Employer, with such duties as are customarily associated with such position.  The Employee's duties shall include being responsible for overseeing the Employer's marketing, promotion, publicity and sales personnel for advertising, meeting with clients, maximizing the Employer's advertising revenue.

Section 3.     Extent of Services.  The Employee shall devote her entire working time, attention, and energies to the performance of her duties and shall not be engaged in any other business activity, whether or not pursued for gain.  The Employee shall at all times faithfully and to the best of her ability perform her duties under this Agreement.  The duties shall be rendered at the Employer's office in New York, New York, or at such other place or places and at such times as the needs of the Employer may from time-to-time dictate.

Section 4.     Term.  The term of this Agreement shall begin on August 15, 2002 ("Effective Date"), and shall be terminable by the Employee upon three months written notice to the Employer or immediately in cases of termination by the Employer pursuant to Section 6 below. If Employee terminates, the Employer shall be obligated to pay Employee her total compensation including salary, commission and benefits during the above-referenced ninety-day period so long as Employee continues to be ready, willing and able to provide her services for the duration of the ninety days. This Agreement shall not give the Employee any enforceable right to employment beyond this term.

Section 5.     Compensation.

5.1     Base Compensation.  The Employee will receive a base salary of $200,000 per year, payable in accordance with the Employer's standard payroll procedures, presently bi-monthly installments.  The Employee is eligible for performance-based bonuses, but there is no assurance or expectation that bonuses will be paid.  Bonuses will be paid, if at all, in the sole discretion of the company's President.

PAGE 1 - EMPLOYMENT AGREEMENT

5.2    Commission.  In addition to the base compensation set forth in Paragraph 5.1, above, the Employee shall receive a commission based on a percentage of net sold advertising sales resulting from the efforts of the Employer's sales representatives, excluding any clients serviced by Sandra J. Brant which are not listed on any other salesperson's account list.  This commission (the "Commission") shall be calculated as a variable percentage of the revenue anticipated for each year's February issue through January issue budget (the "Books Budget").  Each year's Books Budget and the variable percentage to be applied shall be determined on an annual basis during the month of November in consultation with the Employee but in the sole discretion of the Employer.  If net sold advertising revenue in a particular year exceeds that year's Books Budget (excluding that revenue attributable to Sandra Brant), then the Employer shall provide the Employee with an additional "override commission" calculated at five percent (5%) of the net sold advertising sales in excess of said Books Budget.  If net sold advertising revenue in a particular year falls short of that year's Books Budget (excluding that revenue attributable to Sandra Brant), then the Employee shall reimburse the Company at year end for that portion of the Commission received by the Employee resulting from such unsold advertising for that year.  The Books Budget and variable percentage for February 2002 through January 2003 is attached hereto as Schedule "1".  The Books Budget and variable percentages for subsequent years, if applicable, shall be later attached to and incorporated into this agreement as consecutively numbered schedules (the budget and percentages for February 2003 through January 2004 would be attached as Schedule "2", and so on).  The Commission shall be payable as a monthly draw and reconciled at year end (February).   If there are any disputes as to which clients are serviced by Ms. Brant, the Employer's decision shall control.

5.3    Benefits.  The Employee shall receive medical, dental, life and disability insurance and other fringe benefits provided to full-time, non-union employees of the Employer.

5.4    Expenses.  The Employer shall reimburse the Employee for reasonable out-of-pocket expenses incurred by the Employee in fulfilling her duties.  The Employer shall, within its financial means and constraints, provide the Employee with suitable office facilities, equipment, supplies, and staff.

Section 6.    Termination.

6.1    For Cause.  The Employer may terminate the Employee's employment at any time "for cause" with immediate effect upon delivering written notice to the Employee.  For purposes of this Agreement, "for cause" shall include:  (a) embezzlement, theft, larceny, material fraud, or other acts of material dishonesty;  (b) conviction of or entrance of a plea of guilty or nolo contendere to a felony or other crime which has or may have a material adverse effect on the Employee's ability to carry out her duties under this Agreement or upon the reputation of the Employer; (c) conduct involving moral turpitude; (d) gross insubordination or repeated uncorrected insubordination after written warning by the company's President or other officer of the company; or (e) material and continuing failure by the Employee to perform the duties described in this Agreement for at least sixty (60) days after written warning by an officer of the company . Upon termination for cause, the Employer's sole and exclusive obligation will be to

PAGE 2 - EMPLOYMENT AGREEMENT

pay the Employee her compensation and commission earned through the date of termination, and the Employee shall not be entitled to any compensation or commissions after the date of termination.

6.2    <u>Upon Death</u>.  In the event of the Employee's death during the term of the this Agreement, the Employer's sole and exclusive obligation will be to pay to the Employee's spouse, if living, or to her estate, if her spouse is not then living, the Employee's compensation and commissions earned through the date of death.

6.3    <u>Upon Disability</u>.  The Employer may terminate the Employee's employment upon the Employee's total disability.  The Employee shall be deemed to be totally disabled if she is unable to perform her duties under this Agreement by reason of mental or physical illness or accident for a period of six consecutive months.  Upon termination by reason of the Employee's disability, the Employer's sole and exclusive obligation will be to pay the Employee her compensation and commissions earned through the date of termination.

6.4    <u>Without Cause</u>.  The Employer may terminate the Employee's employment without cause at any time.  If terminated without cause, the Employee shall be entitled to one month's severance pay for every year that the Employee has been in the hire of the Employer.  The salary upon which the severance is to be calculated shall consist of a base amount of $200,000 plus the commission earned from advertising revenue based on the issues closed as of the date of termination for that fiscal year only.  For the purposes of this paragraph alone, the Employee's date of hire shall be deemed February 14, 1994.  If the Employee is terminated prior to the end of the year, the Employee shall receive the entire one-month severance for said partial year.  The severance shall be paid to Employee over a six-month period in equal monthly installments, commencing upon the date of termination.

In the event the Company merges, transfers all or substantially all of its stock or transfers or sells the assets comprising Interview Magazine to a third-party or entity, this shall be considered a termination "without cause" unless this Agreement shall inure to the benefit of, be binding upon and be assumed by such resulting or surviving transferee corporation and this Agreement shall continue in full force and effect and shall entitle Employee and her heirs, beneficiaries or representatives to the same compensation, benefits, perquisites, payments and other rights as would have been their entitlement had such consolidation, merger, transfer of assets or formation of such partnership or joint venture not occurred.

<u>Section 7</u>.    <u>Solicitation of Employees / Non-compete</u>

7.1    During the term of this agreement and for a period of two years after the Employee's employment with the Employer has been terminated by either party, the Employee will not directly or indirectly induce or attempt to persuade any former, current or future employee, agent, manager, consultant, director, or other participant in the Employer's business to terminate such employment or other relationship in order to enter into any relationship with the Employee, any business organization in which the Employee is a participant in any capacity whatsoever, or any other business organization in competition with the Employer's business.

PAGE 3 - EMPLOYMENT AGREEMENT

7.2.    During the term of this agreement, the Employee will not directly or indirectly become involved in advertising sales services for competitive publications (including, but not limited to entertainment and fashion related publications) and any other similar activities deemed competitive by the Employer.

7.3. Indirect Activity. The term "indirectly," as used in Section 7.1 and 7.2 above, includes acting as a paid or unpaid director, officer, agent, representative, employee of, or consultant to any enterprise, or acting as a proprietor of an enterprise, or holding any direct or indirect participation in any enterprise as an owner, partner, limited partner, joint venturer, shareholder, or creditor.

Section 8.    Severability. The covenants set forth in this Agreement above shall be construed as a series of separate covenants, one for each county in each of the states of the United States to which such restriction applies. If, in any judicial proceeding, a court of competent jurisdiction shall refuse to enforce any of the separate covenants deemed included in this Agreement, or shall find that the term or geographic scope of one or more of the separate covenants is unreasonably broad, the parties shall use their best good faith efforts to attempt to agree on a valid provision which shall be a reasonable substitute for the invalid provision. The reasonableness of the substitute provision shall be considered in light of the purpose of the covenants and the reasonable protectable interests of the Employer and the Employee. The substitute provision shall be incorporated into this Agreement. If the parties are unable to agree on a substitute provision, then the invalid or unreasonably broad provision shall be deemed deleted or modified to the minimum extent necessary to permit enforcement.

Section 9.    Confidentiality. The Employee acknowledges that she will develop and be exposed to information that is or will be confidential and proprietary to the Employer. The information includes customer lists, marketing plans, pricing data, product plans, software, and other tangible and intangible information. Such information shall be deemed confidential to the extent not generally known within the trade. The Employee agrees to make use of such information only in the performance of her duties under this Agreement, to maintain such information in confidence and to disclose the information only to persons with a need to know. Employee agrees to maintain this confidentiality and agrees to not make use of such information even after she is no longer employed by the Employer.

Section 10.    Remedies. The Employee acknowledges that monetary damages would be inadequate to compensate the Employer for any breach by the Employee of the covenants set forth in this Agreement. The Employee agrees that, in addition to other remedies which may be available, the Employer shall be entitled to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any breach, or both, without the necessity of proving actual damages.

Section 11.   Miscellaneous

11.1    This Agreement is personal to the parties and cannot be assigned or sublicensed by any act of either party or by operation of law without the other party's prior written consent.

11.2    Notwithstanding where it is signed, this agreement will be governed by and interpreted under the internal substantive laws of the State of New York and the United States, without reference to conflicts of laws provisions.  The parties hereby consent to, and will not contest, the exclusive jurisdiction of the courts of the State of New York with respect to all disputes arising hereunder. Any proceedings, notices and documents served upon either party in accordance with this Agreement will be deemed to have been properly served upon such party in the State of New York, and any such service will thereby confer personal jurisdiction upon such party, and each of the parties hereby waives all objections and defenses as to personal jurisdiction in such jurisdiction or jurisdictions.  All disputes arising hereunder will be adjudicated in the State, City and County of New York before a single arbitrator pursuant to the commercial arbitration rules of the American Arbitration Association ("AAA") (other than claims for preliminary injunctive relief or other pre-judgment remedies); and the prevailing party (plaintiff or defendant) will be entitled to recover, in addition to any other relief awarded, its reasonable attorneys' fees and other costs and expenses. If no single arbitrator can be agreed upon by the parties, the arbitrator(s) will be selected in accordance with the rules of AAA.  The arbitrator will be empowered to order specific performance and injunctive relief.

11.3    This agreement will be binding upon the parties' respective affiliates, employees, subcontractors, representatives, agents, and authorized assigns.

11.4    The parties are independent of one another, and nothing in this agreement will be deemed to constitute either the partner, joint venturer, employee, or agent of the other. Except as expressly provided in this agreement or otherwise agreed in writing, neither party will have any right or power to obligate or bind the other party in any manner.

11.5    Neither this agreement nor any provision hereof will be construed against either party on the ground that it was drafted by that party.  To the maximum extent possible, each provision of this agreement will be interpreted so as to be valid and effective under all applicable laws.  In the event that any provision is deemed under any applicable law to be prohibited or invalid, that provision will be deemed ineffective and/or modified to the minimum extent necessary in order to bring it into compliance with the law consistent with the intent of the parties.

11.6    Except as expressly otherwise provided herein, the expiration or termination of this agreement will not relieve either party of any obligation or liability that accrues hereunder, nor affect or impair any right that arises hereunder, prior to such expiration or termination.

11.7    This Agreement cannot be amended, modified or waived except in a written document signed by the party having the obligation.

PAGE 5 - EMPLOYMENT AGREEMENT

11.8    The waiver by either party of any breach of this agreement will not be considered or operate as a waiver of any prior or subsequent breach.

11.9    This agreement constitutes the entire agreement between the parties, and supersedes all previous agreements, understandings and discussions relating to the subject matter hereof.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the date first above written.

INTERVIEW, INC.


By:    Deborah Blasucci
Title:    Exec. V.P. / CFO

Victoria Fuller

PAGE 6 - EMPLOYMENT AGREEMENT

# SCHEDULE "1"

## FEBRUARY 2002 ISSUE THROUGH JANUARY 2003 ISSUE

BOOKS BUDGET 2002 = U.S. $11,895,772

(852 Pages at $13,787 net per page
equaling $11,746,853; plus 20 inserts
at $7,446 net per page equaling
$148,919)

Employee's Commission for the February 2002 issue through the January 2003 issue shall be
calculated at:

1.  .40% commission on the first $8,000,000 of revenue;

2.  .45% commission on the next $2,250,000 of revenue; and

3.  .48% commission on the remaining $1,645,772 of revenue.

PAGE 7 - EMPLOYMENT AGREEMENT



August 27, 2003

Ms. Victoria Fuller
872 Carroll Street
Brooklyn, New York 11215

Re:    Interview, Inc. / Victoria Fuller / Employment Agreement

Dear Victoria:

Please refer to the Employment Agreement, dated as of August 15, 2002, between you
and Interview, Inc. (the "Agreement").

This will confirm that Interview and you have agreed to amend the Agreement as
follows:

Section 5.2 includes the sentence *"If net sold advertising revenue in a particular year
exceeds that year's Books Budget (excluding that revenue attributable to Sandra Brant),
then the Employer shall provide the Employee with an additional "override commission"
calculated at five percent (5%) of the net sold advertising sales in excess of said Books
Budget."*   In that sentence, "five percent (5%)" shall hereinafter be replaced with "one
percent (1%)".

Except as amended herein, the Agreement and all of the terms and conditions thereof
shall remain in full force and effect.  Please confirm your acknowledgement and
agreement of this change by signing where indicated below and returning a copy of this
letter to me.

Sincerely,

Deborah Blasucci
Chief Financial Officer


                              Acknowledged and Agreed:


                              _____
                              Victoria Fuller



April 1, 2004

Ms. Victoria Fuller
872 Carroll Street
Brooklyn, New York 11215

Re:     Interview, Inc. / Victoria Fuller / Employment Agreement / Second Amendment

Dear Victoria:

Please refer to the Employment Agreement, dated as of August 15, 2002, between you
and Interview, Inc. (the "Agreement") and that letter agreement, dated August 27, 2003,
between you and Interview, Inc., which amended the Agreement (the "Amendment").

This will confirm that Interview and you have agreed to further amend the Agreement as
follows:

Section 5.2 of the Agreement is hereby replaced in its entirety with the following:

> 5.2 *Commission.*  In addition to the base compensation set forth in Paragraph 5.1.
> above, the Employee shall receive a commission based on a percentage of net
> sold advertising sales resulting from the efforts of the Employer's sales
> representatives, excluding any clients serviced by Sandra J. Brant which are not
> listed on any other salesperson's account list.   This commission (the
> "Commission") shall be calculated as a variable percentage of the revenue
> anticipated for each year's February issue through January issue budget (the
> "Books Budget").  Each year's Books Budget and the variable percentage to be
> applied shall be determined on an annual basis during the month of November in
> consultation with the Employee but in the sole discretion of the Employer.
> However, commencing with the Books Budget projected for the February 2004
> issue through the January 2005 issue, the Employee's total commission shall be
> increased or decreased each year by the same percentage which the then current
> year's projected Books Budget increases or decreases from the prior year's Book
> Budget.  If net sold advertising revenue in a particular year exceeds that year's
> Books Budget (excluding that revenue attributable to Sandra Brant), then the
> Employer shall provide the Employee with an additional "override commission"
> calculated at one percent (1%) of the net sold advertising sales in excess of said
> Books Budget.  If net sold advertising revenue in a particular year falls short of
> that year's Books Budget (excluding that revenue attributable to Sandra Brant),
> then the Employee shall reimburse the Company at year end for that portion of

*the Commission received by the Employee resulting from such unsold advertising for that year. The Books Budget and variable percentage for February 2002 through January 2003 is attached hereto as Schedule "1". The Books Budget and variable percentages for subsequent years, if applicable, shall be later attached to and incorporated into this agreement as consecutively numbered schedules (the budget and percentages for February 2003 through January 2004 would be attached as Schedule "2", and so on). The Commission shall be payable as a monthly draw and reconciled at year end (February). If there are any disputes as to which clients are serviced by Ms. Brant, the Employer's decision shall control.*

Except as amended herein, the Agreement and all of the terms and conditions thereof shall remain in full force and effect. Please confirm your acknowledgement and agreement of this change by signing where indicated below and returning a copy of this letter to me.

Sincerely,

Deborah Blasucci
Chief Financial Officer

Acknowledged and Agreed:

_____ 4/23/04
Victoria Fuller

INT V Fuller Amendment Ltr

# REVISED SCHEDULE "3"

## FEBRUARY 2004 ISSUE THROUGH JANUARY 2005 ISSUE

BOOKS BUDGET 2004 = U.S. $12,876,816

Employee's Commission for the February 2004 issue through the January 2005 issue shall be calculated at:

      1.    .80% commission on the first $8,500,000 of revenue;

      2.    .85% commission on the next $2,700,000 of revenue; and

      3.    .96% commission on the remaining $1,676,814 of revenue

Override Commission calculated at one percent (1%) of the net sold advertising sales in excess of said Books Budget

It is understood that Employer shall pay to Employees 85% of such Commission in monthly installments throughout the year and a reconciliation shall be conducted on or soon after February 14, 2005.

Exhibit "B"

## Schedule of Salary Continuation Benefits For Full Time Employees

**Short term disability benefits are payable according to the schedule below. The Company will pay benefits based on years of service and will subtract any payments for the New York State Disability Benefit Law (DBL) coverage.**

| Length of Employment | Company Supplemental Salary | Insured Benefit |
|---|---|---|
| 4 weeks up to 1 year | | DBL & LTD ** |
| 1 + years up to 2 years | 100% of normal earnings for up to 1 wk DBL Benefit | DBL & LTD |
| 2 + years | 100% of normal earnings for up to 2 wks DBL Benefit | DBL & LTD |
| 3 years | 100% of normal earnings for up to 3 wks DBL Benefit | DBL & LTD |
| 4 years | 100% of normal earnings for up to 4 wks DBL Benefit | DBL & LTD |
| 5 years | 100% of normal earnings for up to 5 wks DBL Benefit | DBL & LTD |
| 6 years | 100% of normal earnings for up to 6 wks DBL Benefit | DBL & LTD |
| 7 years | 100% of normal earnings for up to 7 wks DBL Benefit | DBL & LTD |
| 8 years | 100% of normal earnings for up to 8 wks DBL Benefit | DBL & LTD |
| 9 years | 100% of normal earnings for up to 9 wks DBL Benefit | DBL & LTD |
| 10 years | 100% of normal earnings for up to 10 wks DBL Benefit | DBL & LTD |
| 11 years | 100% of normal earnings for up to 11 wks DBL Benefit | DBL & LTD |
| 12 years | 100% of normal earnings for up to 12 wk DBL Benefit | DBL & LTD |
| 13 years or more | 100% of normal earnings for up to 26 wks DBL Benefit | DBL & LTD |

\*   The DBL benefit is a State Mandated benefit insured through Zurich American Insurance Company. The current benefit begins after a disability of 7 days and is equal to 50% of earnings to a maximum of $170 per week. Benefits continue for up to 26 weeks.

\*\*   The Long Term Disability benefit is insured through The First Reliance Standard Insurance Company. The benefit begins following 90 days of disability and is equal to 60% of earnings up to $7,500 per month. Benefits may continue to age 65.

Marie Mascaro
Director of Human Resources

F:/BRANT/HR/USERS/Recept/HR/disability

Revised: 9/1/06

P 000110

Exhibit "C"



March 14, 2007

Ms. Victoria Fuller
872 Carroll Street
Brooklyn, New York   11215

Dear Victoria,

We regret to inform you that in the last several weeks we have received evidence that you have engaged in certain illegal and unethical conduct in your capacity as Vice President/Associate Publisher. We have been investigating these matters and are greatly concerned. Therefore, effective immediately, you are suspended without pay while our investigation continues.

At the conclusion of our investigation, we will determine whether to continue your employment, or to terminate your employment for Cause and take other appropriate actions.

In addition, we hereby put you on formal notice that your continued failure to submit the doctor's certification of your fitness for return to work required in the FMLA form and specifically demanded by me in my two emails to you on March 5th and 7th is gross insubordination.

During the suspension, you are not to come to the office or engage in Company business. You may not contact clients, vendors or employees.

Please leave your Company Blackberry with Marie Mascaro. You remain subject to the terms of the Employment Agreement, including Section 7 (Solicitation of Employees/Non-Compete) and Section 9 (Confidentiality), as well as your Non-Solicitation and Confidentiality Agreement with the Company and its restrictions on the use of Brant's Proprietary Information and other Company property.

Sincerely,

Deborah Blasucci

Deborah Blasucci
Executive Vice President/CFO



March 27, 2007

**BY FEDEX**

Victoria Fuller
872 Carroll Street
Brooklyn, NY 11215

Re: Termination of Employment

Dear Victoria:

We regret the timing of this letter in light of your surgery, but we have now concluded our investigation referenced in Debbie Blasucci's letter suspending you on March 13th. Effective immediately, your employment is hereby terminated for Cause in accordance with Section 6.1 of the Employment Agreement between you and Interview, Inc. dated August 15, 2002. Cause includes, but is not limited to, your violations of Sections 6.1(a) and (d).

You remain subject to the terms of the Employment Agreement, including Section 7 (Solicitation of Employees / Non-Compete) and Section 9 (Confidentiality), as well as your Non-Solicitation and Confidentiality Agreement dated July 27, 2004 and its restrictions on the use of Proprietary Information and other Company property.

All employee benefits are cancelled effective immediately. However, in light of your doctor's March 12th letter in which he says that you will be having surgery on March 26 and further states that "the recovery period will likely be three months," the Company will pay the premiums for continuation of your individual medical insurance under COBRA through June 30, 2007, even though the Company has no obligation to do so under the law. Thereafter, you will be required to pay the premiums if you want to continue these benefits. We enclose information for your review about COBRA.

We wish you a speedy and full recovery.

Sincerely,

Sandra Brant

Enclosure