## Alan Rich

**From:**   Alan Rich
**Sent:**   Friday, June 18, 2010 5:27 PM
**To:**   'Peter Shapiro'
**Subject:** Fuller v Interview - Proposed Amended Complaint

Attached please find the Proposed Amended Complaint referred to during our recent conference with the Court. Please advise if you will consent to the amendments. Otherwise, as the Court indicated, we will have to plan a briefing schedule.

Thank you.

Alan J. Rich, Esq.
**Law Offices of Alan J. Rich, LLC**
26 Court Street, Suite 1801
Brooklyn, NY  11242
Tel: 212.921.2244
ARich@RichLaw.US

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **VICTORIA FULLER**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -against- | ) Civ. Action No.: 07 cv. 5728 (RJS/DCF) |
| | ) |
| **INTERVIEW, INC**.; **BRANT PUBLICATIONS,** | ) **PROPOSED** |
| **INC**., as the owner of Interview, Inc.; **PETER** | ) <u>**AMENDED COMPLAINT**</u> |
| **BRANT,** individually and as the shareholder and | ) |
| owner of Brant Publications, Inc.; **SANDRA J.** | ) |
| **BRANT,** individually and as the shareholder and | ) |
| owner of Brant Publications, Inc.; and **DEBORAH** | ) **JURY TRIAL DEMANDED** |
| **BLASUCCI,** individually and as the Executive Vice | ) |
| President and Chief Financial Officer of Interview, | ) |
| Inc. and Brant Publications, Inc., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

---

Plaintiff, Victoria Fuller, by her attorneys, the Law Offices of Alan J. Rich, LLC, as and for her complaint against defendants, alleges as follows:

## <u>THE PARTIES</u>

1.      Plaintiff, Victoria Fuller ("Fuller" or "plaintiff"), is a citizen of the State of New York, residing in, Kings County.

2.      Defendant, Brant Publications, Inc. ("Brant" or "defendant"), is a corporation authorized to do business in New York State with its principal place of business located in New York County at 575 Broadway, 5th Fl., New York, New York 10012.

3.      Defendant, Interview, Inc. ("Interview" or "defendant"), is a privately held company.

4.      At all times relevant to this action, Interview, Inc., published Interview Magazine.

5.      From approximately 1987 to date, Brant has owned, directly or indirectly, Interview, Inc.

6.      Defendants Peter Brant ("Peter Brant" or "defendant") and Sandra J. Brant ("Sandra Brant" or "defendant") were married and had five children together.

7.      Between December 2006 and March 2007, Interview was wholly owned by shareholders Peter Brant and Sandra Brant through intermediate corporations, including, but not limited to, Brant.

8.      Between December 2006 and March 2007, Brant was owned by shareholders Peter Brant and Sandra Brant.

9.      Interview is wholly owned, at present, by shareholder Peter Brant directly and/or through intermediate corporations, including, but not limited to, Brant, and is located in the same business offices as Brant.

10.      Defendant, Sandra Brant, was the Publisher of Interview magazine, as well as the Chief Executive Officer and President of Brant.

11.      The position of Publisher of a magazine is traditionally to administer and to be responsible for the business, non-editorial aspects of the publication, including but not limited to advertising, printing, distribution and sales.

12.      In or about January 2008, defendant, Sandra Brant, sold her interest in Brant to Peter Brant, and/or entities owned directly or indirectly by Peter

Brant, and was removed as the Publisher of Interview magazine, as well as the Chief

Executive Officer and President of Brant.

13.     With the sale of defendant, Sandra Brant's ownership interest in

Brant to Peter Brant, Ingrid Sischy, resigned as Editor-In-Chief of Interview Magazine.

14.     Ingrid Sischy, was and is the domestic partner of Sandra Brant and

her 18 year tenure as Editor-In-Chief at Interview Magazine, continued during the entire

time that Sandra Brant was Publisher of Interview.

15.     Defendant, Peter Brant, is the Chairman of Brant.

16.     Defendant Peter Brant, is an American newsprint magnate, art

collector, and film producer. He is the Chairman and C.E.O. of White Birch Paper

Company, a private company, headquartered in Greenwich, Connecticut. Brant is also the

owner of Brant Publications, Inc., which specializes in publishing about art in America

and antiques via its three magazines: *Interview* (founded by Andy Warhol), *Art in

America*, and *The Magazine Antiques*.

17.     White Birch Paper is a manufacturer of high-quality newsprint,

directory paper, and paperboard with mills in the United States and Canada. As of

December 2007, White Birch Paper operated six pulp and paper mills; three in Quebec,

Canada and three in the United States. Together, these mills produce more than 1.3

million tons of newsprint and directory paper. Headquartered in Greenwich, Connecticut,

White Birch Paper is a privately owned, family-run business that manufactures and ships

paper products to customers in North America and all over the world.

18.     Peter Brant is an owner/breeder of a number of Thoroughbred

racehorses, notably Waya, the winner of the 1979 Eclipse Award for Outstanding Older

Female Horse, and Gulch whose wins include the Breeders' Cup Sprint and who was voted the 1988 Eclipse Award for Outstanding Sprint Horse.

19.     Peter Brant is the owner of a world class modern art collection.

20.     Peter Brant was the Executive Producer of the 1996 film Basquiat and the 2000 film Pollock, in which his wife, Stephanie Seymour, a/k/a Stephanie Brant, had an acting role.

21.     Peter Brant is divorced from his first wife, defendant, Sandra Brant, former Publisher of Interview Magazine.

22.     Peter Brant was an initial investor and long time shareholder in computer games company Take-Two Interactive, maker of "Grand Theft Auto." Ryan A. Brant, son of Peter Brant, founded Take-Two Interactive at age 20. In February 2007, Ryan Brant pleaded guilty to a false filing charge in connection with a six-year stock-option backdating scheme dating back to the company's 1997 initial public offering. In 2001, the SEC sued the Take-Two Interactive for conspiring to inflate earnings. Mr. Brant, the company and his associates settled those charges in 2005 for about $14 million and restated four years of earnings.

23.     In 2008, defendant, Peter Brant, hired Alan Katz as Publisher of Interview Magazine.

24.     In late 2008, defendant, Peter Brant, terminated Alan Katz as Publisher of Interview.

25.     Peter Brant hired Samantha Fennell, former Associate Publisher of Elle, to become Publisher of Interview Magazine effective February 2, 2009.

26.     Samantha Fennell accepted the position of Publisher of Interview Magazine but declined the position after learning that Interview's coeditorial director Fabien Baron and creative director Karl Templer had been terminated.

27.     Peter Brant never advised Samantha Fennell of the termination of Fabien Baron and Karl Templer.

28.     After Barron and Templer suddenly left, Ms. Fennell decided not to report to work as Publisher as per her scheduled February 9, 2009 start date.

29.     A few years prior to Plaintiff's termination, Plaintiff, Victoria Fuller herself, hired David Hamilton to work as an advertising sales representative.

30.     At the time Plaintiff hired Hamiliton as a sales representative, he had no prior advertising sales experience.

31.     Hamilton worked under the supervision of plaintiff, Victoria Fuller, during her tenure at Interview.

32.     After Ms. Fennell decided not to accept the position of Publisher, David Hamilton, was appointed Publisher.

33.     While Associate Publisher at Interview Magazine, plaintiff, Victoria Fuller, regularly performed major functions of Publisher of Interview, particularly because Publisher, Sandra Brant was frequently out of the office for a variety of reasons.

34.     Plaintiff, Victoria Fuller, was fully qualified to carry out the duties of Publisher of Interview Magazine.

35.     Plaintiff would have been an appropriate and the likely choice for Publisher of Interview, had defendants not discriminated and retaliated against her, resulting in her termination.

36.     Defendant, Deborah Blasucci ("Blasucci" or "defendant"), is currently serving as the Executive Vice President and Chief Financial Officer of Interview and Brant.

## JURISDICTION AND VENUE

37.     Original jurisdiction of this Court is founded upon 28 U.S.C. §1331 and 1332 (a), *et. seq*., in that this is a civil action wherein the matters in controversy arise under the laws of the United States, 29 U.S.C. § 2615.

38.     This Court has personal jurisdiction over the defendants named in the complaint pursuant to 29 U.S.C. § 2617(a) because the defendants conduct business in this district and because an act proscribed by 29 U.S.C. § 2615 occurred within this district.

39.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b) and (c), and 29 U.S.C. § 2615, because the defendants conduct business in this district, and all the acts, omissions and events giving rise to the violations of 29 U.S.C. § 2601 alleged in the complaint occurred in this district.

## SUMMARY OF CLAIMS

40.     Plaintiff was diagnosed with acute gastroenteritis and requested reasonable accommodations of defendants and time for medical leave and to seek treatment.

41.    In response to plaintiff's taking medical leave, defendants discriminated and retaliated against plaintiff for seeking reasonable accommodation of her disability by, among other things: (a) refusing to pay plaintiff's full compensation to which she is lawfully entitled; (b) engaging in an intentional campaign designed to undermine and sabotage plaintiff in carrying out her job responsibilities; (c) created a hostile environment by demanding that plaintiff not communicate with any Interview staff or clients, as well as undermining plaintiff's authority and marginalizing her management role, in an effort to force her from her employment; (d) when plaintiff did not resign, defendants sought to discharge her "for cause," thereby avoiding paying some $350,000 in severance pay and encouraged, supported and accepted the fabrication of claims of fraud and theft against plaintiff; (e) and ultimately terminating her employment. Defendants discriminated and retaliated against plaintiff, and/or aided, abetted and conspired with the other defendants, *inter alia,* in permitting, assisting and advising defendants to perpetrate a fraud upon plaintiff, by fabricating knowingly false claims for defendants to use and assert and to deprive plaintiff of her rights and compensation.

42.    Subsequent to plaintiff's return to work from her first medical leave, plaintiff requested further reasonable accommodation of defendants to permit her to take sick leave for surgery to treat previously diagnosed but untreated perineorrhaphy - a progressively debilitating medical condition. In response, defendants terminated plaintiff's employment because of her disability.

43.    In this action, plaintiff seeks: (i) compensatory and statutory liquidated damages, along with statutory attorneys' fees for defendants' willful violation of plaintiff's rights under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601

*et. seq.*; and (ii) compensatory and punitive damages for defendants' willful violation of plaintiff's rights under the New York State Executive Law § 296, *et. seq.* and the New York City Administrative Code § 8-502(a), et. seq.

## FACTS COMMON TO ALL CLAIMS

### *Fuller's Employment*

44.     Plaintiff commenced her employment at Interview on, or about, February 14, 1994, in the capacity of Fashion Advertising Manager. In, or about, April of 1994, plaintiff was promoted to the position of Fashion Director with added responsibilities for managing the majority of the client accounts in the fashion, accessories and jewelry sector of the market.

45.     In, or about, March of 1996, plaintiff was promoted to the position of Interview's Advertising Director, reporting directly and exclusively to the magazine's President, CEO and Publisher, Sandra Brant. In this new position, plaintiff's scope of responsibilities was expanded to include direct supervision and management of the Sales, Promotion and Marketing Departments at Interview.

46.     In, or about, April of 1998, plaintiff was promoted to the position of Interview's Associate Publisher, with an expansion of the corresponding responsibilities and managing authority, including, among other things, recruitment, training, direction and management of the sales staff and independent agents for the territories of the United States, Italy and France.

47.     On, or about, August 15, 2002, Interview and plaintiff executed and made effective the employment agreement (the "Agreement"), memorializing in

writing the terms and conditions governing plaintiff's employment, including her duties and compensation, along with the specific obligations and responsibilities of each party to the other.

48. In, or about, February of 2004, plaintiff was promoted to the position of Interview's Vice President and Associate Publisher, with the corresponding expansion of responsibilities and managing authority.

49. During her tenure at Interview, plaintiff was directly and proximately responsible for the expansion of Interview's advertising revenue more than threefold by, among other things, developing new client accounts in the heretofore underdeveloped sectors of the market and substantially increasing revenue from certain key accounts that plaintiff was responsible for servicing personally.

50. At all relevant times, plaintiff performed her duties in an exemplary manner. No disciplinary actions for cause or other adverse employment actions had ever been taken by defendants against plaintiff prior to the unlawful actions taken by defendants in retaliation for the plaintiff's medical leaves, as more particularly set forth in this complaint.

51. At all relvant times, defendants had a responsibility to maintain a work environment free of unlawful discrimination and retaliation.

**Plaintiff's Medical Leaves and Defendants' Willful Violations of Plaintiff's Rights**

**A. *Plaintiff's First Medical Leave***

52. On, or about, December 7, 2006, plaintiff suffered severe abdominal pains and left work in the early afternoon to seek urgent medical attention from her attending physician, Dr. Jerry Clements, M.D. ("Dr. Clements"). Upon

completion of the examination, Dr. Clements diagnosed acute gastroenteritis as the principal cause of plaintiff's illness and instructed her not to return to work and to take an immediate one month medical leave. Plaintiff's health condition was to be reassessed at the end of that initial medical leave period.

53.     On the afternoon of December 7, 2006, Interview's Director of Human Resources, Ms. Marie Mascaro ("Mascaro " or "HR Director"), received a medical note from Dr. Clements, stating that Mrs. Fuller was to go on medical leave effective immediately for a period of one month.

54.     Later that day, plaintiff phoned Mascaro and confirmed her receipt of the doctor's note, informed Mascaro of the need for an immediate medical leave and to request the necessary forms to apply for the Short-Term Disability ("STD") benefits.

55.     At no time prior to the onset of plaintiff's illness did defendants post the required public notice explaining employees' rights to a medical leave pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et. seq.* ("FMLA"), or furnish other material informing plaintiff of her foregoing statutory rights.

56.     On, or about, December 8, 2006, plaintiff's husband, Mr. Graham Fuller, received in person from Mascaro the STD benefits claim documents, to be prepared and submitted by plaintiff.

57.     In, or about, afternoon of December 8, 2006, plaintiff contacted her executive assistant by phone and requested to have certain work files forwarded to plaintiff's home so that she could continue with her work to the degree possible. *Fuller was informed that her assistant was instructed by the defendants not to comply with her requests. Plaintiff also attempted to remotely access work-related records on her office

computer, only to find that such heretofore customary and regular course of business

remote access had been summarily terminated by defendants, without any prior notice to

plaintiff. By the end of the same day, plaintiff received a written communication from the

HR Director, which stated, in part:

> "We will temporarily reassign staff to deal with clients and other
> related matters, [to] assure that all tasks are performed…
> Accordingly, you should not contact clients or staff during your
> period of disability leave. We need to avoid miscommunications
> and are concerned that our hard work would be counterproductive
> if you attempt to continue to perform tasks. …I understand you
> requested certain files to be sent to you at home. In light of the
> above, we do not think it appropriate to send work to you at home.
> Since your assistant will be temporarily reassigned, and in order to
> avoid any confusion, please direct any questions or concerns to
> Debbie or me."

58.     Defendants took actions to isolate plaintiff from contact with her

subordinates, clients and colleagues at Interview and from all work related matters.

Defendants also acted to turn and manipulate employees and others against plaintiff in an

unprecedented fashion and contrary to regular course of business practices throughout

plaintiff's tenure at Interview.

59.     Defendants had never before directed any employee not to contact

staff and clients while that employee was on medical leave.

60.     On December 7, 2006, the day plaintiff, Victoria Fuller, advised

defendants that she needed to take her medical disability/FMLA leave, notwithstanding

supporting medical documentation, defendant Debbie Blasucci immediately acted in a

hostile manner to plaintiff and asked employees at Interview to report to her whether

Mrs. Fuller *"looked sick."*

61.     Defendants immediately directed plaintiff not to communicate with her co-employees, her clients and even her assistant. This was the only time in company history that defendants forced the isolation of an employee on medical leave and did so as part of an attempt to foment false claims about plaintiff without her knowledge, to isolate her and to generally impose an environment so hostile as to cause her to wish to resign.

62.     Such hostile actions, among others, were discriminatory.

63.     Defendants used plaintiff's FMLA leave as an opportunity to isolate plaintiff, discriminate against her and to create an environment so hostile that she would resign.

64.     Immediately after plaintiff indicated she was taking a medical/disability leave, Ms. Blasucci first orally asked Vince Frezzo, Executive Beauty Director of Interview if Mrs. Fuller had "looked sick" at a client meeting at Biotherm's offices. Blasucci was seeking a pretext to take some action against plaintiff.

65.     Where Interview was given medical documentation that plaintiff was taking medical leave due to gastroenteritis, a company employee's non-medical opinion about whether plaintiff "looked sick" would not have been relevant, and could likely provide misinformation. Seeking an unqualified co-employee's opinion about plaintiff's medical condition, demonstrated defendants' hostile attitude and attempt to find some pretext to discriminate against plaintiff.

66.     If defendants wished to inquire about plaintiff's medical conditions and/or her ability to perform work, they were obligated to communicate with plaintiff, obtain further medically related information and/or obtained an independent medical opinion, which they did not do.

67.     In defendants' further effort to undermine plaintiff's right to a medical leave, David Hamilton, who was plaintiff's subordinate, sought to establish that plaintiff was not ill and on December 7, 2006, wrote to Vince Frezzo, with a courtesy copy to Debbie Blasucci, "These are my notes from the conversation this morning between you, me and Debbie regarding your meeting yesterday at 10:00am with Biotherm: You met the Sr. VP of Marketing at Biotherm, whom you and Victoria had met about 1-1/2 years ago. Victoria arrived on time and contributed to the meeting in her usual way. She appeared to be ok and was not sick. She left the meeting early because she said she had to go uptown to an appointment. She pretty much seemed herself at the meeting. There was nothing physically wrong with her that was apparent. She showed no signs of being sick. She talked about the magazine and added a few comments to your presentation. She did not seem incoherent."

68.     On December 10, 2006, Vince Frezzo responded to Hamilton's above email, by emailing to Interview President, Sandy Brant, David Hamilton, and Debbie Blasucci with a "cc" to Human Resources director Marie Mascaro.

69.     Frezzo confirmed his view of the impropriety of this request in an email stating;

> "This is the first time I have received such a follow-up memo regarding a meeting with Victoria Fuller, the AP of Interview magazine. As per our conversation I met with the client along with Victoria Fuller at Biotherm's offices. In a subsequent meeting between David Hamilton and Debbie Blasucci; I confirmed the meeting. At this point I was asked by David and Debbie if Victoria looked sick. I said she did not appear sick but this is a question that should be directed to Victoria as I don't know how she actually felt. I asked if

there was something they were trying to
communicate regarding her health. Both
David and Debbie said no and not to worry.

You can imagine my surprise to get such a
follow-up memo; again asking the health of an
employee of Interview. In my experience of
managing at Fortune 100 companies; I have
found a question regarding someone's health
in the organization to be an HR and legal
matter. You can understand the ethics
regarding such a matter.

I look for guidance from Sandy Brant or HR
regarding the company's policy on how any of
these questions should be handled in the
future.

Respectfully, Vince Frezzo"
[BRANT ARB HC 001705]

70.    Because Vince Frezzo detected that the inquiry about plaintiff,

Victoria Fuller's health was improperly motivated, defendants falsely sought to claim that

they were confirming that the client meeting on Friday was without incident.

71.    On December 11, 2006 at 11:51 a.m., Marie Mascaro, Interview's

head of Human Resources, emailed Vince Frezzo stating, "Dear Vince, It is our policy

not to reveal or discuss any confidential medical information. Without disclosing any

such information, we needed to confirm that the client meeting on Friday was without

incident. Thank you for your concern. Marie Mascaro." [BRANT ARB HC 1704-1705]

72.    Similarly, later that day, December 11, 2006, at 2:18 p.m., David

Hamilton emailed Vince Frezzo stating, "[t]he original conversation that Debbie Blasucci

and I had with you on Friday morning was in response to Debbie's concern about

Victoria's well-being and her concern that the meeting on Thursday with Biotherm went

without incident." [BRANT ARB HC 001840].

73.     The excuses that were provided in both emails that Interview needed to confirm that the meeting with Biotherm went "without incident" were false. Vince Frezzo had already advised Blasucci and Hamilton orally of that fact. Moreover, the confirming email sought to portray information about the appearance of plaintiff's health. In addition, it was not Interview's practice to confirm in writing that a meeting went without incident.

74.     Defendants participated in a fraud, using a false excuse as a pretext to cover up the reasons for Blasucci and Hamilton's inquiries into plaintiff's health, and the attempt to confirm same in the Hamilton email to Frezzo.

75.     Defendants knew the purpose of the inquiry by Blasucci and Hamilton was to attempt to use any information against plaintiff Fuller, rather than to "confirm that the client meeting on Friday was without incident."

76.     Defendants had no reason to believe that "[it was Interview's policy not to reveal or discuss any confidential medical information" because Interview had no such policy. Had that been the "policy," Hamilton should not have been permitted to inquire about and discuss Fuller's health at the outset.

77.     These efforts attempted to, and did, discriminate and retaliate against plaintiff, *inter alia,* for taking an FMLA medically required leave and based on her disability.

78.     On or about December 11, 2006, Plaintiff's then attorney, Wendy Lazar, wrote defendants and complained of the hostile and wrongful treatment of plaintiff, including isolating plaintiff from her staff and clients.

79.    Defendants failed to correct their wrongful, hostile and discriminatory actions toward plaintiff. On the contrary, their actions increased and became worse.

80.    On, or about, December 14, 2006, plaintiff submitted to the defendants completed STD benefits claim documents, receipt and sufficiency of which was duly acknowledged by defendants in writing.

81.    On, or about, January 1, 2007, defendants, in violation of the terms governing plaintiff's employment, unilaterally and without prior notice, ceased paying plaintiff the full compensation that was due and owing.

82.    Defendants' refusal to pay plaintiff's full compensation was discriminatory and retaliatory.

83.    On, or about, January 2, 2007, following the reexamination of plaintiff's medical condition, Dr. Clements instructed Fuller to remain on medical leave until February 1, 2007, subject to his further evaluation of plaintiff's health at the end of January 2007.

84.    On, or about, January 9, 2007, plaintiff submitted to defendants revised STD benefits claim documents, informing defendants of the change in the plaintiff's expected return to work date. Receipt and sufficiency of said revised STD benefits claim documents was duly acknowledged by defendants in writing.

85.    On, or about, January 25, 2007, following the reexamination of plaintiff's health condition, Dr. Clements instructed Fuller to remain on medical leave until March 12, 2007, subject to his further evaluation of plaintiff's health in February 2007.  Corresponding certification by Dr. Clements was provided to defendants.

86.     On, or about, February 8, 2007, following the reexamination of plaintiff's medical condition, Dr. Clements informed plaintiff that her health condition was improving and she would be able to resume normal work on March 2, 2007. Corresponding certification was provided by Dr. Clements on revised STD benefits claim documents, which were provided to defendants the following day, February 9, 2007. Receipt and sufficiency of said revised STD benefits claim documents was duly acknowledged by defendants in writing.

87.     On, or about, February 16, 2007, during a routine follow-up examination, Dr. Clements became concerned with another serious health condition of plaintiff, unrelated to the previously diagnosed gastroenteritis, and referred her for a consultation with a specialist, Dr. Christina Kwon, MD ("Dr. Kwon"). Following a series of tests, Dr. Kwon diagnosed plaintiff with perineorrhaphy - a progressively debilitating medical condition that necessitates surgical intervention. Despite Dr. Kwon's concerns with the plaintiff's deteriorating medical condition, she was unable to schedule Fuller for surgery until May of 2007.

88.     In February 2007, Plaintiff commenced an arbitration claim against defendants for their wrongful actions against her, including but not limited to defendants' breach of contract and wrongful denial of her job, with all its authority, compensation, perquisites and benefits.

## B.  Plaintiff's Return to Work After the First Medical Leave

89.     Plaintiff's medical leave of absence ended on March 1, 2007 and she promptly returned to work at the defendants' place of business on the morning of March 2, 2007. However, plaintiff found that she was unable to gain entry to her office

because the locks to her office door had been changed by defendants. Subsequently,

plaintiff also found that access to her office computer had been blocked by defendants.

90.     Upon her return to work, plaintiff found that during the period of

her medical leave of absence, the long established business practices governing the day-

to-day work of plaintiff's direct subordinates had been countermanded by defendants,

thereby undermining and sabotaging plaintiff's authority and her ability to carry out her

job responsibilities in accordance with the terms governing her employment.

91.     On, or about, March 5, 2007, defendant Blasucci demanded that

plaintiff  produce  a fitness-for-duty certification despite the fact that defendants were in

receipt of prior writings from plaintiff's physician attesting to her need for medical leave

and that she would be fit to return to work on March 2, 2007.

92.     The following day, March 6, 2007, at plaintiff's request, Dr.

Clements wrote an additional fitness-for-duty certification and faxed it to plaintiff at

Interview. The document's facsimile was not sufficiently legible, requiring plaintiff to

visit her physician's office to personally obtain the original of the fitness-for-duty

certification document, which was promptly delivered by plaintiff to defendants on

March 15, 2007.

### C.  Plaintiff's Second Medical Leave

93.     On, or about, March 9, 2007, Dr. Kwon, in consultation with Dr.

Clements, determined that due to plaintiff's deteriorating medical condition, unrelated to

plaintiff's other medical conditions for which she took her first medical leave, it was

medically advisable for plaintiff to promptly undergo a corrective surgical procedure.

94.     On, or about March 12, 2007, plaintiff informed defendants about her need for a second medical leave, delivering in person to Interview's Human Resources Director, Marie Mascaro, a written document from plaintiff's physician, indicating that she would be undergoing the required surgical procedure on March 26, 2007.

95.     On, or about, March 26, 2007, plaintiff underwent the surgical procedure, performed by Dr. Kwon, and was discharged from the hospital on March 28, 2007.

### D. *Examples of Defendants' Discriminatory and Retaliatory Actions Against Plaintiff*

96.     On, or about, March 14, 2007, plaintiff was handed by Mascaro a letter authored by Blasucci and dated March 14, 2007, informing plaintiff that she was being suspended without pay, pending investigation by defendants into alleged illegal and unethical conduct engaged by plaintiff in her capacity as Vice President/Associate Publisher ("Suspension Letter"). The Suspension Letter never identified the basis for the defendants' allegations.

97.     On, or about, March 27, 2007, just one day after her surgery, plaintiff received via courier at her residence a letter authored by Sandra Brant, dated March 27, 2007, informing plaintiff that: "… we have now concluded our investigation referenced in Debbie Blasucci's letter suspending you on March 13th [sic]. Effective immediately, your employment is hereby terminated for Cause in accordance with Section 6.1 of the Employment Agreement between you and Interview, Inc. dated August

15, 2002. Cause includes, but not limited to, your violations of Sections 6.1(a) and (d)…

All employee benefits are canceled effective immediately …" ("Termination Letter").

98.     The Termination Letter never identified with any specificity the facts supporting the determination that purportedly served as the basis for the defendants' adverse employment actions against plaintiff.

99.     At no time prior to commencement of plaintiff's medical leaves have the defendants served upon plaintiff notices required pursuant to the terms of her employment, nor provided plaintiff with adequate time to cure any alleged cause for adverse employment action by defendants against plaintiff.

100.     Plaintiff was unlawfully suspended and then summarily terminated from her employment because of her medical disability and for seeking reasonable accommodations for medical leaves associated with her disability.

101.     Defendants encouraged and requested employees and former employees to provide false and exaggerated information against plaintiff, inciting staff and former staff to make false and dubious claims that plaintiff submitted false expense reports and committed other wrongful acts.

102.     Defendants proffered such false allegations as part of a discriminatory and retaliatory pretext to claim that plaintiff breached her employment contract so defendants could terminate plaintiff. Defendants conducted a so-called investigation of plaintiff's acts and expenses where it never so investigated other persons who were not disabled or did not request medical leave. Defendants knowingly used incomplete, dubious and false information in their "investigation."

103.    Plaintiff, and those who were involved in preparing plaintiff's expense reports, properly submitted those reports which were contemporaneously approved by Brant and Interview without dispute.

104.    The procedure Blasucci established in her capacity as CFO, for resolving erroneous or disputed expense reports, was to return the report to the employee for revision and resubmission of the expense report by that employee.

105.    Defendants never rejected, returned or disputed plaintiff's expense reports during the entire time of her employ at Interview Magazine.

106.    Blasucci personally approved of all of plaintiff's expense report payments and never rejected nor returned for resubmission any of plaintiff's expense reports.

107.    Interview and Blasucci regularly returned erroneous expense reports to other employees.

108.    It was not until the discovery process in this lawsuit that defendants claimed that plaintiff's expense reports were erroneous or false.

109.    Defendants never contemporaneously provided plaintiff the opportunity to either explain the contents of her expense reports or modify same at any time, up to and including the time of her termination.

110.    Other employees, managers and executives of Interview and Brant Publications regularly charged or claimed a variety of expenses as business expenses which are now being claimed to constitute "personal" expenses in connection with Victoria Fuller.

111.    Numerous "personal" expenses were routinely approved or not disputed when submitted by certain other employees, managers and officers.

112.    Defendants now claim that allegedly "personal" expenses of Plaintiff that were routinely acceptable expenses for others, form the basis, in whole or in part, for Plaintiff's termination.

113.    The amounts apparently claimed by defendants in dispute total in the hundreds of dollars.

114.    Plaintiff's annual compensation was approximately $325,000 annually.

115.    Plaintiff was responsible for approximately $17 million in revenue annually.

116.    Plaintiff, at her own initiative and not at the request of any officer, manager or employee of Interview or Brant, regularly reimbursed her employer by check, amounts she charged to her employer for her own personal use, such as for her personal use of messenger services.

117.    Other employees, managers and executives regularly charged non-business and personal items to Interview and/or Brant and were not subject to any discipline.

118.    Defendants wrongfully terminated plaintiff's employment contract and falsely claimed that plaintiff stole or embezzled company funds.

119.    All of plaintiff's expenses were checked by defendants Interview, Brant and Blasucci when submitted and were contemporaneously approved for payment.

120.    Defendants discriminated against plaintiff because of her disability, the perception of her disability, medical leaves, and retaliated against her for seeking reasonable accommodation for her disabilities and attempts to enforce her rights, by, among other things: (a) refusing to pay plaintiff's full compensation to which she was lawfully entitled pursuant to the terms of the Employment Agreement and company policies; (b) an intentional campaign designed to isolate, undermine and sabotage plaintiff in her position as Vice President and Associate Publisher and in carrying out her job responsibilities; and (c) suborning plaintiff's authority and marginalizing her management role, in an effort to force her from her employment prior to her unlawful termination by defendants.

121.    Defendants created a hostile work environment, wrongfully terminated plaintiff, deprived her of a promotion for which she was uniquely qualified to the Publisher position at Interview magazine, and otherwise discriminated and retaliated against plaintiff.

122.    Upon information and belief, defendants knew, or should have known, that their actions were unlawful and violated plaintiff's rights under 29 U.S.C. §§ 2601 *et. seq.*, New York State Executive Law § 296, *et. seq.* and the New York City Administrative Code § 8-502(a), *et. seq.*

123.    Defendants willfully and knowingly conspired, aided and abetted to discriminate and retaliate against plaintiff and to deprive plaintiff of her civil rights.

124.    Upon information and belief, defendants acted maliciously and/or in reckless disregard to plaintiff's protected civil rights.

125.    As Vice President and Associate Publisher of Interview Magazine, Plaintiff was in a position of responsibility and performed satisfactorily, the tasks normally performed by a publisher of a magazine.

126.    Plaintiff could not rise to the position of Publisher of Interview Magazine because as long as defendant Sandra Brant was an owner of Brant, her contract provided for her to be Publisher.

127.    Upon the termination and departure of Sandra Brant from Brant and Interview Magazine when her interests were bought by Peter Brant and/or companies he owned in 2009, plaintiff, Victoria Fuller would have risen to the position of Publisher of Interview Magazine, but for defendant's discriminatory and retaliatory actions.

128.    Plaintiff has suffered extraordinary emotional distress and psychological damages as a consequence of defendants' actions, including isolating her from her coworkers at Interview, intentionally alienating her subordinates from her, by spreading false information about plaintiff including accusing her of embezzlement and/or theft of company funds, by wrongfully withholding pay and commissions from plaintiff, by humiliating her in her work situation and by otherwise acting in a hostile, discriminatory and retaliatory manner.

## FIRST CAUSE OF ACTION: FMLA

129.    Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as if fully set forth herein.

130.    Defendants failed to reasonably accommodate plaintiff's disability and discriminated and retaliated against plaintiff in the terms and conditions of her

employment because of her disability and because of her requests for family medical

leave and failed to leave her job open and available for her in violation of the Family

Medical Leave Act ("FMLA") of 1993 29 U.S.C. §§ 2601 *et. seq.*

131.    Defendants interfered with plaintiff's rights to take an FMLA

medical leave but also significantly interfered with plaintiff's right to return to her job

after her first FMLA leave.

132.    The right to take an FMLA leave is virtually illusory without the

right to return to the same job following such leave.

133.    Defendants used plaintiff's absences while on leave to undermine

her authority and to conspire to discriminate, retaliate, suspend and terminate plaintiff.

134.    As a result, plaintiff suffered damages for lost past and future

earnings as limited pursuant to the FMLA, liquidated damages pursuant to the FMLA and

other employment benefits, of TWO MILLION ($2,000,000) DOLLARS, plus costs,

attorneys' fees and disbursements in connection with this case.


## SECOND CAUSE OF ACTION:
## NEW YORK STATE HUMAN RIGHTS LAW

135.    Plaintiff repeats and re-alleges each and every allegation contained

above with the same force and effect as if fully set forth herein.

136.    Defendants failed to reasonably accommodate plaintiff's disability,

and otherwise discriminated and retaliated against plaintiff in violation of the New York

State Human Rights Law, Executive Law § 290, *et. seq.*

137.    As a result of such discrimination and retaliation, plaintiff suffered

damages for lost past and future earnings, other employment benefits, and emotional

injuries and other compensatory damages in an amount of TEN MILLION ($10,000,000)

DOLLARS.


### THIRD CAUSE OF ACTION: NEW YORK CITY HUMAN RIGHTS LAW

138.    Plaintiff repeats and re-alleges each and every allegation contained

above with the same force and effect as if fully set forth herein.

*139.*    Defendants failed to reasonably accommodate plaintiff's disability,

and otherwise discriminated and retaliated against plaintiff in the terms and conditions of

her employment based on disability and the perception of disability in violation of the

New York City Administrative Code § 8-502(a), *et. seq.*

140.    As a result of such discrimination and retaliation, plaintiff suffered

damages for lost past and future earnings, other employment benefits, and emotional

injuries and other compensatory damages in the amount of TEN MILLION

($10,000,000) DOLLARS.

141.    As a result of defendants' willful and/or reckless disregard for the

protected rights of plaintiff, and based on the respective wealth of the defendants and the

amounts appropriate to punish and deter them from such future wrongful acts, plaintiff

should be awarded punitive damages in the amount of TWENTY-FIVE MILLION

($25,000,000) DOLLARS.


### FOURTH CAUSE OF ACTION: PRIMA FACIE TORT

142.    Plaintiff repeats and re-alleges each and every allegation contained

above with the same force and effect as if fully set forth herein.

143.    Defendants intentionally inflicted harm, without excuse or justification, through acts that would otherwise be lawful.

144.    Plaintiff suffered special damages, including but not limited to the loss of wages, loss of commissions, emotional injuries and other compensatory damages resulting as a consequence of defendants' wrongful actions.

145.    As a result, plaintiff suffered compensatory damages in an amount of TEN MILLION ($10,000,000) DOLLARS.

146.    As a result of defendants' willful and/or reckless disregard for the protected rights of plaintiff, and based on the respective wealth of the defendants and the amounts appropriate to punish and deter them from such future wrongful acts, plaintiff should be awarded punitive damages in the amount of TWENTY-FIVE MILLION ($25,000,000) DOLLARS.

**FIFTH CAUSE OF ACTION:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

147.    Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as if fully set forth herein.

148.    Defendants, by extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to plaintiff.

149.    Defendants extreme and outrageous conduct included, but was not limited to fabricating claims that plaintiff, a valued member of upper management employed in good standing for some 13 years, engaged in acts of fraud and theft and other acts constituting crimes, humiliated plaintiff in front of those over whom she had direct supervisory authority, intentionally isolated plaintiff from her fellow employees and clients by directing her and her co-

employees not to contact each other, using the enforced isolation to create and fabricate false claims against plaintiff, and other intentionally outrageous, humiliating and intentionally injurious acts.

150.    Plaintiff suffered serious emotional injuries including, but not limited to, Post Traumatic Stress Disorder.

151.    As a result, plaintiff suffered compensatory damages in an amount of TEN MILLION ($10,000,000) DOLLARS.

152.    As a result of defendants' willful and/or reckless disregard for the protected rights of plaintiff, and based on the respective wealth of the defendants and the amounts appropriate to punish and deter them from such future wrongful acts, plaintiff should be awarded punitive damages in the amount of TWENTY-FIVE MILLION ($25,000,000) DOLLARS.

**WHEREFORE**, plaintiff demands judgment against defendants as follows:

a) On the First Cause of Action pursuant to FMLA for damages in the amount of TWO MILLION ($2,000,000) DOLLARS, plus attorneys' costs and fees, including but not limited to:

i)   actual damages, pursuant to 29 U.S.C. § 2617(a)(1)(A)(i)(I);

ii)  statutory liquidated damages, pursuant to 29 U.S.C. § 2617(a)(iii); PLUS,

iii) statutory attorney fees, pursuant to 29 U.S.C. § 2617(a)(3);

b) On the Second Cause of Action pursuant to the New York State Human Rights Law for damages in the amount of TEN MILLION ($10,000,000) DOLLARS;

c) On the Third Cause of Action pursuant to the New York City Human Rights Law for actual damages in the amount of TEN MILLION ($10,000,000) DOLLARS, and punitive damages in the amount of TWENTY-FIVE MILLION ($25,000,000)

DOLLARS and attorneys' fees pursuant to New York City Administrative Code §
8-502(a), *et. seq.*;

d)  On the Fourth Cause of Action for Prima Facie Tort, for actual damages in the
amount of TEN MILLION ($10,000,000) DOLLARS, and punitive damages in
the amount of TWENTY-FIVE MILLION ($25,000,000) DOLLARS;

e)  On the Fifth Cause of Action for Intentional Infliction of Emotional Distress for
actual damages in the amount of TEN MILLION ($10,000,000) DOLLARS, and
punitive damages in the amount of TWENTY-FIVE MILLION ($25,000,000)
DOLLARS;

f)  Fees, disbursements and other costs and interest where permitted by law; and

g)  For such other relief which the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated this 18th day of  June, 2010
Brooklyn, New York

Alan J. Rich, Esq. [AR-4701]
Law Offices of Alan J. Rich, LLC
26 Court Street, Suite 1801
Brooklyn, New York 11242
Telephone (212) 921-2244
Email: ARich@Richlaw.US