26 COURT STREET
SUITE 1801
BROOKLYN, NEW YORK 11242
TEL 212/921-2244
EMAIL: ARICH@RICHLAW.US

**LAW OFFICES OF**
**ALAN J. RICH**, LLC

September 19, 2008

Schulte Roth & Zabel, LLP
919 Third Avenue
New York, NY 10022
Attention: Jill Goldberg Mintzer, Esq.
By email: Jill.GoldbergMintzer@srz.com

Re: **Victoria Fuller v. Interview, Inc., Brant Publications, Inc.,**
**Peter Brant, Sandra J. Brant and Deborah Blasucci**
Doc. No.  07 CV 5728(RJS)

*Confidential – For Negotiation Purposes Only*

Dear Counsel:

As per your request for a settlement demand in this matter, please be advised
that plaintiff demands, at this stage of the case, ▇▇▇▇▇▇ dollars. I have decided to
write a detailed settlement letter for several reasons. First, during the course of our
discussions, it became apparent that defense counsel is in the precarious position of not
being familiar with many key facts. It is clear that defense counsel has been provided a
lot of false information by self-interested actors, information which might not appear
false at first glance. It is our obligation to clarify.

Some of the defendants, such as Sandy Brant, have limited their own
communications with defense counsel. Further there are major personal and business
conflicts among the defendants that likely mean that obtaining the straight facts from the
several defendants is nearly impossible. Some of defendants answers to Plaintiff's
Interrogatories are, on their face, clearly false.

Accordingly, this letter may be closer to an opposition to a motion for summary
judgment than an ordinary settlement letter. While we asked for the right to obtain
preliminary discovery for the mediation and received it, defendants did not ask for any. It
is our intention here to be forthright and explain plaintiff's case. If the parties seriously
undertake mediation in this matter, I believe that the parties are best served by knowing

what to expect from each other if the case were to proceed to trial. While the parties obviously prefer to resolve this matter sooner rather than later, this comprehensive letter should make it quite clear that plaintiff is entirely prepared to proceed to trial if need be.

## Summary of the Claim

Defendants have caused Victoria Fuller to suffer both significant past lost earnings and significantly diminished future earnings. On March 14, 2007, just two days after plaintiff advised that she required surgery and would be out for some three months, defendants suspended plaintiff from her job without pay, in violation of the FMLA and a host of anti-discrimination laws. Its suspension was also in violation of her contract. They falsely and maliciously accused her in writing of **"certain illegal and unethical conduct."** This is the culmination of hostile behavior that defendants exhibited since plaintiff took a prior FMLA leave.

Plaintiff sustained serious emotional damages that are permanent in nature and for which she has received professional treatment under the care of her general physician, a psychotherapist and a psychiatrist. Plaintiff never had taken any psychotropic medication nor had she ever been under the care of a psychiatrist before. As a consequence of defendants' harassment, suspension, termination and wrongful claims of theft plaintiff began to suffer from depression, adjustment disorder and anxiety. Plaintiff continues under the care of a psychiatrist and on medication.

The significant likelihood of punitive damages because of the demonstrably intentional and malicious discrimination and retaliation, characterized by numerous outright fabrications, in order to harass and terminate plaintiff, significantly increase the value of this already very substantial case.

Defendants caused these injuries in violation of plaintiff's protected rights as a person with a disability under the New York City Human Rights Law (NYCHRL) and pursuant to her rights under the FMLA. Defendants discriminated and retaliated at precisely the time when an employee is in most need of protection -- when they suffer a disability and take a protected FMLA leave. Defendant is subject to double damages pursuant to the FMLA, and extensive compensatory past and future compensatory damages, as well as punitive damages, under the NYCHRL.

## Plaintiff Financially Damaged, Emotionally Injured and Denied Likely Succession As Interview Publisher

Plaintiff's title at the time of her termination from Interview Magazine was "Vice President, Associate Publisher." However she was largely functioning as the Publisher of

the magazine. Plaintiff currently earns ██████ less than half the $325,000 she earned as V.P., Associate Publisher at Interview Magazine.

Plaintiff's job at Interview Magazine was essentially to run the day-to-day management of the business and advertising side of the magazine. The normal progression in the publishing industry for a promotion from Associate Publisher, the number two position, would be to Publisher, the number one position.

However, because Sandra Brant operated Interview less as a business and more as a personal plaything, defendant Brant spent about 50% of her time out of the office. Brant Publications was acquired when Peter Brant and Sandra Brant were still married. Though they have both moved on to other partners personally, Sandra Brant retained a 50% ownership in the company.

However, Mrs. Brant simply did not spend sufficient time in the office to properly run the magazine on her own. For example, Sandra Brant and her partner, Editor-In-Chief, Ingrid Sischy, went to Europe four times a year for two weeks at a time and were both out of the office extensively on personal vacations. As Mrs. Fuller began to take on more and more of the tasks ordinarily performed by a magazine publisher, she inquired about promotion.

It was explained to her that *plaintiff could not be named "Publisher" because, pursuant to a contract between Sandra and Peter Brant, Mrs. Brant had the right to retain the "Publisher" title over the three Brant Publications magazines.* Accordingly, despite increased duties, plaintiff was given the promotion from Associate Publisher to "Vice-President, Associate Publisher," even though such a title is generally outside of industry norms. As long as Sandra Brant had a financial interest at Interview, no matter how great plaintiff's responsibilities grew, no matter the quality of her work, she would never have the title of Publisher.

With Peter Brant's buyout this year of Sandy Brant ownership interest in Brant Publications and her removal as Publisher of Interview, Victoria Fuller was the likely successor as Publisher, and was, at the very least, a very strong candidate for that position. Plaintiff's promotion to Publisher would have increased her earnings from the company, and raised her value outside the company, in a market where the title of Publisher is particularly prestigious.

Plaintiff was capable of taking the magazine in affirmative directions toward profitability that defendant, Sandy Brant, did not, and actually resisted. The magazine was allowed to flounder as Sandy Brant's personal toy. Now that Mrs. Brant has left Interview, the magazine is being reinvigorated.

For the purpose of seeking work in the future, plaintiff cannot even get a reference from the company where she spent most of her adult working life. Entering as a sales person, Mrs. Fuller rose to become second in charge as Vice President,

-3-

Associate Publisher at Interview Magazine. Plaintiff was repeatedly promoted due to her excellent performance. The only reason she did not rise to Publisher was because defendant Sandy Brant, was the co-owner and ex-wife of the other owner of the magazine, Peter Brant.

The harassment, threats, isolation, refusal to pay plaintiff her salary and fabrication of facts, caused plaintiff serious emotional injury, for which plaintiff sought treatment.

## Likihood of Punitive Damages Award In This Action

The significant compensatory damages for past and future pecuniary loss and emotional injury are likely a mere fraction in comparison to the punitive damages that naturally flow in a case like this. While most law suits don't result in punitive damages awards, retaliation cases are the exception, because the intent, recklessness or malice usually present in retaliation cases already meet the elements required in punitive damages cases.

Juries are particularly angered by defendants who retaliate against plaintiffs for asserting their rights. Juries are *even more incensed by employers that lie and scheme to cover up their wrongful and discriminatory behavior.* Here, defendants left behind them a demonstrable and irrefutable trail of lies and efforts to coerce employees beholden to the company, to make false and exaggerated statements.

All defendants are individuals and entities of significant means. Defendant Peter Brant in particular is a magnate in the paper business. Individuals are personally liable for compensatory and punitive damages under the NYCHRL.

## Defendants' Lack of Credibility – A Matter of Record

Defendants begin with little credibility for several reasons. It is always suspicious when an employer terminates a long-standing employee with a good work record by throwing the proverbial kitchen sink at them. Here, defendants claim to have fired plaintiff for virtually *every reason possible, including incompetence, poor performance, insubordination and theft.* The reasons are contradicted by plaintiff's history of 13 years of excellent work, raises and promotions. Defendants own documents are contradictory on central and material issues in the case. Other documents simply don't prove what they claim to, or are otherwise entirely unreliable.

Various responses to the Interrogatories are demonstrably false and misleading. Defendants' reputation for truth and veracity is, as a matter of public record, generously stated, dubious. For example, Peter Brant, was imprisoned for 84 days for willful failure to maintain federal tax records.

The close relationships amongst the parties and supporting witnesses evidencing potential for bias is quite remarkable in this case. The Publisher of the magazine, Sandy Brant, was the ex-wife of half owner, now full owner, Peter Brant. Sandy Brant is the domestic partner of then Editor-In-Chief, Ingrid Sischy. The head of personnel, Marie Mascaro, is the domestic partner of Brant Publications' Chief Financial Officer, defendant Deborah Blasucci. These relationships define the partiality expected and demonstrated by these individuals.

Additionally, we have learned that since her departure, defendant Sandy Brant has made significant efforts to dissuade Interview's clients from continuing to advertise with Interview magazine. Aside from the demonstrably fabricated defense, this animosity amongst several of the defendants bodes poorly for any ability to cooperate effectively in defending this suit.

The claims that plaintiff was discharged for dishonesty and theft, will enrage a jury when shown that these were allegations fabricated by defendants who coerced Interview employees to falsely incriminate plaintiff.

These claims are even more feeble when they **allege theft in the hundreds of dollars** where plaintiff earned some $325,000 a year and was responsible for approximately $17 million in revenue annually.

Since plaintiff did not even have a company credit card nor check-writing authority, the defendants have had to stoop to falsely accusing plaintiff of a pattern of improperly *seeking reimbursement for her own out of pocket expenses, which defendants contemporaneously reviewed, approved and reimbursed plaintiff for.* These were reimbursements for items like business related cabs, subways and lunches. Defendants' attempts to substantiate fraud rely on erroneous information, such as out of date calendars that were not even maintained by plaintiff. Some charges find support only from employees of defendants who were clearly rewarded and promoted for their loyalty to defendants.

In an attempt to gild the lily, defendants also claim to have discharged plaintiff for poor performance and insubordination. It is patently absurd that after plaintiff was continually promoted for well over a decade, having attained the position of second in charge at Interview, that defendants suddenly found that she was incompetent. The claim that plaintiff was terminated for gross insubordination for allegedly failing to provide a "return to work certification" will similarly infuriate any jury. One could hardly invent a better example of *pretext* than this.

**Defendants' "Investigation" Omits Best Information Source – Plaintiff Herself**

If defendants genuinely became aware of improprieties such as the submission of false expense reports, one would think that they would have asked the employee in question to explain or justify the expenses. After all, this was the practice in the company with other employees. Incredibly, defendants **never asked plaintiff to explain a single one of these allegedly improper expense claims. Defendants do not even claim to have learned of any of this information until plaintiff was already out on medical leave.** Though defendants never asked a single question about the expenses contemporaneous to the submission of the expense reports, they also failed to ask plaintiff about them while she was on leave, or even when she returned from leave. **Defendants had ample opportunity again to inquire of plaintiff when she returned from her first medical leave, as defendants acknowledge that they had been investigating plaintiff for "several weeks."** [Blasucci letter to plaintiff, March 14, 2007]

**Defendants never asked plaintiff to explain these expenses before terminating her because the decision was unrelated to the facts. Having the facts could only hinder defendants from firing her. This failure to inquire of plaintiff further leads to the conclusion that the reasons claimed are pretext.**

**Defendants' outrageous behavior, compounded by owner Peter Brant's failure to respond to communications by plaintiff or her attorney seeking his intervention to rectify the situation, will further leave these jury with no choice but to hold defendants liable for compensatory and punitive damages.**

**Peter Brant Is Also Liable**

Though defense counsel has claimed verbally that Mr. Brant had no knowledge of the matters at hand, the evidence is to the contrary. Plaintiff and her counsel wrote to seek Mr. Brant's intervention in connection with defendant's wrongful actions against her. Clearly Mr. Brant saw the correspondence since he then retained counsel, Mark E. Brossman, of Schulte Roth, who was later retained as defense counsel in this case.

**As further evidence of Mr. Brant's knowledge, Mr. Brossman cc'd Peter Brant on his December 19, 2006 response to plaintiff's counsel. Obviously, were Mr. Brant not in the loop, his lawyer would not have cc'd him. Mr. Brant is legally responsible for his own actions and for his failures to act.**

**DEFENDANTS' ACTS OF DISCRIMINATION:**
**Discrimination/Retaliation Began Immediately Upon Taking Disability/ FMLA Leave**

The very day plaintiff Victoria Fuller advised defendants on December 7, 2006 that she needed to take her medical disability/FMLA leave, notwithstanding supporting

medical documentation, defendant Debbie Blasucci immediately acted in a hostile and shocking manner to plaintiff and asked employees at Interview to report to her whether Mrs. Fuller *"looked sick."*

Ms. Blasucci first orally asked Vince Frezzo if Mrs. Fuller had "looked sick" at a client meeting at Biotherm's offices. Blasucci was fishing for a reason to take some action against plaintiff. This question was searching for some pretext to act against plaintiff. Certainly, where plaintiff has been given medical documentation that plaintiff was taking medical leave due to gastroenteritis, company employee's non-medical opinion about whether plaintiff "looked sick" cannot be of any relevance. Rather, it demonstrates defendants' hostile attitude and attempt to find some pretext to discriminate against her.

Blasucci followed her question to Frezzo with an email seeking written confirmation about whether plaintiff "looked sick." The email was apparently circulated to Interview President, Sandy Brant, David Hamilton, Vince Frezzo and cc'd to Marie Mascaro. [BRANT ARB HC 001704-06]

Blasucci asked Mr. Frezzo to confirm this odd request. Frezzo confirmed this in an email to head of Human Resources, Marie Mascaro, stating:

> I was asked by David and Debbie if Victoria looked sick. I said she did not appear sick but this is a question that should be directed to Victoria as I don't know how she actually felt. I asked if there was something they were trying to communicate regarding her health. Both David and Debbie said no and not to worry.
>
> You can imagine my surprise to get such a follow-up memo; again asking the health of an employee of Interview. In my experience of managing at Fortune 100 companies; I have found a question regarding someone's health in the organization to be an HR and legal matter. You can understand the ethics regarding such a matter."

> [BRANT ARB HC 001704-06]

Mr. Frezzo was properly troubled by the nature of defendant's initial oral inquiry and the follow-up email inquiry. Mr. Frezzo clearly detected the hidden agenda behind it. The inquiry by a CFO of a company, Deborah Blasucci, was improper, harassing and not even within her realm of duties. All these factors point to defendants' wrongful intent on the very day plaintiff advised of her need for an FMLA leave.

In addition, to further evidence defendants' intention to terminate plaintiff immediately upon her taking her FMLA leave, the day after plaintiff began her first leave of absence, the combination for the lock to the office entrance was changed.

**Plaintiff's Medical/Disability Leave Was Proper – Defendants Liable for Double Damages Under FMLA**

Defense counsel has asserted in its "Eleventh Defense" against liquidated damages that defendants acted in good faith. A party can avoid liquidated double damages if it proves that it acted "in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation" of the FMLA. 29 USCS § 2617 (a) (1) (A) (iii).

Defendant cannot avoid such double damages. A "good faith" defense would require that defendant acted reasonably and that it was justified in acting as it did. If an employee is accused of filing false expense reports, particularly where these accusations are up to two years old, how is it possibly "good faith" to fire the employee without providing the employee the opportunity to explain the expenses?

Similarly, defense counsel has suggested in passing that plaintiff's leaves of absence were not medically justified. However, had defendants actually disputed the medical need for the leaves at the time that they were requested, there could have been some potential for argument that they acted in "good faith."

In fact, defendants never disputed that Mrs. Fuller's leaves were medically justified FMLA leaves. Plaintiff tendered documentation from her doctor to her employers that were never questioned.

If the company did have any genuine doubts as to whether Mrs. Fuller's medical needs were authentic, they could have asked her for follow-up information -- *but never did*. They could have asked for clarification of medical information and authentication from her doctor *– but never did*. [29 cfr 825.307 (a)] FMLA regulations specifically grant the employer the additional right to perform a medical examination by a doctor of their choosing to verify the medical need for the leave *– but defendants never sought a second opinion*. [29 cfr 825.307 (a) (2)]

Therefore, *pursuant to the FMLA alone*, plaintiff is entitled to liquidated (double) damages, plus interest, attorneys fees and costs.

**Discriminatory Isolation of Plaintiff and Hostile Work Environment**

Thus began a pattern of efforts calculated to harass and isolate plaintiff, and to fabricate claims against her. Defendants sent the clear message to Victoria Fuller and all

employees at Interview that she was *persona non grata*. Plaintiff would be targeted for elimination once she became ill and took her FMLA leave.

Plaintiff was forbidden from being in contact with any Interview personnel and they were forbidden to contact her. The false pretext that defendant stated was so plaintiff could focus on her "recovery." [Mascaro email to Fuller, 12/10/2006, P 000104]

However, this "contact ban" was neither a general policy nor the normal practice of defendants with regard to other employees. It was a tactic used exclusively against the plaintiff to harass and isolate her from her job, particularly as defendants planned to terminate plaintiff or harass her into quitting.

Marie Mascaro also fabricated in her email to plaintiff that plaintiff told Mascaro she was feeling "incoherent." This claim was one of many used as an excuse to forbid all contact between plaintiff and co-employees. Plaintiff *never* stated that she was "incoherent." Nor would such a complaint even be consistent with plaintiff's medical condition – gastroenteritis, the condition that required her to take the leave.

Even assuming *arguendo* that plaintiff made this absurd statement, there would be no reason that plaintiff and the Interview staff be completely forbidden from communicating. It would be normal for plaintiff to talk with employees, since some would want to ask her how she was feeling. Plaintiff had known many of the clients for years and had established relationships with them. Nonetheless, plaintiff was forbidden from communicating with staff and clients for any purpose. "You should not contact clients or staff during your period of disability leave." [Mascaro email to Fuller, 12/10/2006, P 000104] This constituted part of the hostile environment defendant had created.

When Victoria Fuller initially left on her first FMLA leave, clients were told that she was "unavailable," with no explanation that she was out on medical leave or that she was out on a leave or anything. One client, being given no information, even called Mrs. Fuller at home.

Defendants own extensive documentation demonstrates that they were in the process of isolating plaintiff from all other employees by forbidding their employees from communicating with plaintiff. Defendants were also encouraging others to provide false incriminating information about plaintiff and fabricating false claims against her.

**Defendants Continued Hostility and Isolation of Plaintiff Upon Her March 2, 2007 Return to Work**

In response to Plaintiff's March 2, 2007 return to work from her first FMLA leave, Deborah Blasucci wrote a long, self-serving largely false email on March 5, 2007. There was no explanation as to why the lock to plaintiff's office had been changed, a practice which was generally reserved for when an employee was terminated. There was no

genuine explanation as to why the Associate Publisher of Interview, with some 13 years tenure, was being forced to humiliatingly wait in the reception area where clients and job applicants wait. [email March 5, 2007, P000092]

If truly the new key to plaintiff's office were unavailable, as claimed, there was plenty of empty office space where plaintiff could have sat. Moreover, it was entirely inappropriate for David Hamilton, *who worked for plaintiff, Victoria Fuller*, to come to the plaintiff in front of numerous magazine staff and humiliatingly say to her, "didn't Debblie Blasucci tell you to go and sit in the reception area? Well go and do it!"  It was entirely appropriate for Mrs. Fuller to respond to Mr. Hamilton not to give her orders, since she was his direct superior. However, under the circumstances, in view of the atmosphere that had been created, and since defendants had made it clear to those such as Hamilton that Victoria Fuller would be terminated, Mr. Hamilton was obviously emboldened to give orders to his superior knowing that she would soon be gone. There can be no coincidence that shortly after plaintiff's termination, Hamilton would be promoted to plaintiff's job.

On March 9, 2007, Deborah Blasucci emailed plaintiff stating, "[n]o one at Brant is preventing you from working or undermining you."  This was an obvious lie and Blasucci's own words would show that to be the case.

In Blasucci's March 14, 2007 suspension letter to plaintiff, Blasucci wrote, "[w]e regret to inform you **that in the last several weeks we have received evidence that you have engaged in certain illegal and unethical conduct** in your capacity as Vice President/Associate Publisher. **We have been investigating these matters** and are greatly concerned. Therefore, effective immediately, you are suspended without pay while our investigation continues." [emphasis supplied][1]

---

[1] It appears clear that counsel's ability is limited in its potential representation of defendants, particularly at deposition and trial because they were counsel who advised defendants since shortly after plaintiff took her first medical leave. They were then retained as trial counsel in this action and know first hand what defendants' knowledge and actions were during the relevant pre-suit period. Accordingly, counsel has certain limitations in its representation and cannot suborn perjury. For example, Ms. Blasucci's statement that no one "at Brant [was] preventing you [Mrs. Fuller] from working or undermining you," is fraught with danger for counsel, since it was advising defendants at that time...and clearly defendant were undermining Mrs. Fuller gathering evidence against her at the very time Blasucci denies it. Presumably, defense counsel was involved in the process of advising how to proceed with such an investigation. Defense counsel's ability to represent defendants, who they advised in connection with these matter, is, at the very least, circumscribed, if not outright prohibited. Certainly, the disciplinary rules do not permit counsel to assist the client to commit perjury or perpetrate a fraud.

When Ms. Blasucci emailed plaintiff that no one is preventing her from working or undermining her, she was lying because she had already been carrying out "investigations" for several weeks.

## Refusal to Pay Commissions After FMLA Leave

During the course of her leave, plaintiff was entitled to receive her full salary. The company "Short Term/Long Term Disability – Salary Continuation" policies, written by Marie Mascaro, revised as of 9/1/06, and provided to plaintiff upon the commencement of her leave, stated, "…[o]ur supplemental salary continuation benefit will be equal to 100% of your salary minus the DBL benefit you receive."

After the commencement of her leave, defendants finally admitted that they unilaterally stopped paying plaintiff the commission draw to which she was entitled as part of her compensation package. [Marie Mascaro email, February 5, 2007] While this was a contractual violation, it was also part of the discriminatory and retaliatory actions that gives rise to additional and separate damages under FMLA and the NYCHRL.

Mascaro's explanation, apparently under the authority of Deborah Blasucci, claimed that the reasons for withholding commissions were contained in the Employment Agreement, Secs. 2 (duties) and 5.2 (commissions). Such an excuse was a sham, since neither of these paragraphs provides any grounds or justification for refusal to pay commissions.

Grasping at straws to include some reason to deny plaintiff her commission, Mascaro claimed that plaintiff did not provide acceptable budgets earlier in the fall. Plaintiff's commission was based on the advertising budgets pursuant to contract. However, plaintiff did submit budgets. After plaintiff submitted her last budget in November 2006, Ms. Blasucci failed to respond to plaintiff's requests for specific comments to enable her to modify the budget as requested. [Fuller email 11/29/06] Nonetheless, there was an existing budget. Ms. Blasucci's intentional failure to provide feedback for a revised budget, in either case, does not excuse defendants' refusal to pay plaintiff's commission as required by contract. It is again, another blatant example of pretext to act and discriminate against plaintiff, while claiming some far-fetched reason as justification.

The approval of a budget was obviously not the genuine basis for refusing to pay plaintiff's commission because Interview continued to pay plaintiff her commission *while she was actively on the job though there was not an approved budget. It was not until plaintiff took her FMLA leave, that defendants stopped paying plaintiff's commissions, demonstrating that the FMLA leave, and not the failure to have an approved budget, was the real reason for refusing to pay plaintiff the commissions she was owed. The budget claim was a pretext for discrimination.*

Assuming, *arguendo,* that Blasucci's failure to approve the budget could be attributed to plaintiff, defendants still failed to provide plaintiff with the required notice pursuant to contract, that she was not performing her job.

Para. 6.1 (e) of the Employment Agreement provides for "Termination For Cause" for "…material and continuing failure by the Employee to perform the duties described in the Agreement for at least sixty (60) days after written warning by an officer of the company." Defendants never gave plaintiff such written warning. On the contrary, plaintiff, as per the above 11/29/06 email, sought comments to the budget from Ms. Blasucci but did not receive them. Defendants' argument that they denied paying plaintiff her commissions while out on FMLA leave for contractual reasons is a transparent sham constituting pretext.

**Discriminatory Denial of Tenure Permitting Longer Paid Disability Leave**

By terminating plaintiff during her leave, defendants improperly obviated their obligation to pay plaintiff for up to 26 weeks of paid leave in compliance with its policy. Interview had a written policy regarding salary continuation during short term and long term disability. The policy refers to an attached schedule to determine the "Schedule of Salary Continuation Benefits For Full Time Employees." The schedule provides that where the "Length of Employment" is "13 years or more," the employee receives "100% of normal earning for up to 26 wks DBL [NY State Disability Benefit Law] Benefit."

When plaintiff began her second medical FMLA leave on March 2, 2007, plaintiff was entitled to, at least, the remainder of 26 weeks of compensation for short term disability because she had been employed by Interview for 13 years. Plaintiff began working at Interview on February 14, 1994.

In an effort to limit plaintiff's ability to collect salary and benefits for the full time period. on February 5, 2007. Ms. Mascaro wrote an email that plaintiff stopped accruing tenure pursuant to "[company] policy [which] provides, 'Once employees are on disability they will not accrue any additional tenure for the purposes of increasing their supplemental salary benefits under their existing claim.'" [BRANT ARB HC 001658]

However, this provision is not in the copy of the policy that plaintiff was given and appears to be an outright fabrication, the purpose of which would be to deny plaintiff an additional 14 weeks compensation. Plaintiff had been employed for over 12 years at Interview. However, during the course of her first FMLA leave, plaintiff's tenure reached 13 years. Brant's company policy was to pay 100% of 12 weeks earnings after 12 years of employment. But after 13 years of employment, that would jump to 26 weeks of earnings. [BRANT ARB HC 001658] The author of the policy, last revised as of 9/1/06, was Marie Mascaro herself. There is no basis to deny plaintiff the full 26 week period of benefits based on her tenure and medical need.

**Defendants' Allegations of Dishonesty/Theft Were Fabricated, Intentional and Retaliatory**

Mrs. Fuller never knowingly claimed a single false expense. Rather, plaintiff was so scrupulous, that she *voluntarily reimbursed Interview Magazine by check* for expenses such as overages on her cell phone, and FedEx and messenger service for personal use.  Plaintiff could have easily never reimbursed Interview for these charges, attributed them to the office and gone undetected. Rather, she was meticulous and forthright in paying for her own personal expenses. This is a standard we are confident few other staff and executives in the company met, and are confident that discovery would so demonstrate.

The allegations that plaintiff perpetrated fraud against her employer is not merely mistaken – they are intentional malicious fabrications. They grew out of defendants' discriminatory and retaliatory efforts to deprive plaintiff of her rights, compensation and job.

The allegations offered *by defendants* that accuse plaintiff of such wrongdoings, would be seen by a jury as a malicious, thinly veiled, desperate attempt to create a pretext for plaintiff's discharge. It was not enough to cheat plaintiff out of her full compensation in an effort to take advantage of her disability and FMLA leave. Nor was it enough to isolate plaintiff, subject her to a hostile work environment and then wrongfully fire her. Defendants had to make the classic mistake of gilding the lily by fabricating stories after the fact and concocting false charges against plaintiff.

Several questions must be asked. Why didn't any of the defendants **ever** raise the claims of erroneous expense claims with Mrs. Fuller herself as there might be valid explanations for some or all of the expenses? Interview's practice with employees whose expense reports were contested, was to reject the request and have the employee resubmit. Why was plaintiff denied the same treatment given other Interview employees? Is there any legitimate reason why a long standing devoted employee of 13 years would not, at least, be questioned about alleged wrongdoing before she was terminated?

Who are the alleged accusers? They consist of a small coterie of individuals, all of whom received direct financial and/or professional benefit from defendants. They include David Hamilton, who conveniently got plaintiff's job when she was terminated.

**The Joshua Homer Statement – The Only Employee In America To Be Rewarded for Committing Fraud**

Joshua Homer [BRANT ARB HC 002100-01] provided a written statement on March 7, 2007 incriminating Victoria Fuller for submitting allegedly fraudulent expense

reports *which he prepared and filed*. Though at that time both he and his then girlfriend and wife-to-be, Nadia Uddin, no longer worked at Interview, both would be subsequently rehired by Interview and promoted shortly after his giving this statement.

Though Homer's statement *implicates himself* in knowingly submitting these allegedly fraudulent expense reports, he would be conveniently rehired by Interview after signing the March 7, 2007 statement. Why would any company *rehire and promote* an employee who admitted to committing fraud against the company while in its employ? ***It simply wouldn't!***

If Interview actually thought that Homer assisted in perpetrating financial fraud against the company, Homer would have been, at the very least, *persona non grata*. Homer's statement is a series of poorly concocted fabrications, half-truths and vicious personal attacks. Rather than proving any wrongful acts of plaintiff, Mr. Homer's statement is a prime example defendants' extraordinary efforts to retaliate against plaintiff.

The very timing of Homer's statement suggests retaliation. Victoria Fuller returned from her first FMLA leave on Friday, March 2, 2007. Defendants' emails emphatically claim that they were taken totally by surprise by her return. It appears clear that defendants already believed that plaintiff would choose not to return. They believed that by refusing to pay plaintiff her full compensation while on leave and by isolating her from the entire Interview staff and other hostile treatment, that she would never return.

However, when plaintiff did return that Friday, March 2, 2007, she shocked them and they had to memorialize the "allegations" they had been investigating. Accordingly, the moment plaintiff returned to work from her FMLA leave, they gathered documentation, prepared it and coordinated with Mr. Homer, who was not even employed at Interview at the time, to come in to sign the statement.

FMLA discrimination and retaliation is not merely an issue of an employee's right to *take* the leave, *but equally important to have the right to return to one's job after the leave.* Accordingly, since defendants admit to being caught off guard by her return, they then had to work quickly to find a reason to discharge her. In a classically overreaching way, defendants claimed *every possible reason* – including theft, poor performance and insubordination.

Of course, one gaping flaw in Homer's statement is that *he was the very assistant who prepared Mrs. Fuller's expense reports*. Mrs. Fuller's expense reports were prepared and filed by her assistants, not by Mrs. Fuller. As Mr. Homer's statement clearly indicated, one of his "duties as Victoria's assistant was to file her monthly expenses." He was the one responsible for filing these statements. Assuming Homer's statement were truthful, he **admitted to knowingly filing false financial documents for a period of about a year.**

-14-

**Is Mr. Homer suggesting that he did not know the difference between the truth and a lie? If he were knowingly involved in fraud in filing false expense reports, why didn't he go to any superior at Brant and advise them of such fraud. And why did Brant Publications *rehire this admitted liar if it believed he was knowingly involved in perpetrating these frauds?***

Homer's statement omits significant information. His reference to working "in the entertainment industry" [BRANT ARB HC 002100-01] failed to clarify that the work was as a *stand-up comic, regularly performing in the evenings.* This meant that he would generally not work late at the office because he had to get to his evening comedy gigs. His statement claiming that plaintiff never worked late is false because Homer was the one who was regularly leaving early because of his need to get to his stand-up gigs in the evening.

Homer's statement about the lunch with Nadia Uddin, his then girlfriend, not being a proper business expense, is at best, uninformed, at worst, a bald-faced lie. As matter of common practice, in order to maintain good relations in the small world of publishing, plaintiff would invite former employees to events and to lunch. This is an entirely proper practice since former employees often return or are in a position to help, when information or assistance is needed. By keeping such a door open, even former employees would remain a resource when needed.

Only a person pressured or encouraged to make derogatory comments about plaintiff, would have ever considered writing such a questionable allegation. If Homer firmly believed the expense was improper, why did he include it in the expense report, as he wrote it, or why didn't he report this alleged impropriety to management? Conveniently, the only possible witness to what was said at the lunch meeting between plaintiff and Ms. Uddin *is Nadia Uddin, Joshua Homer's wife.*

Homer claims that he was "forced to print [Fuller's calendar for her] right before she left from work. This caused me to leave work after her and I can safely say that she did not work late." [BRANT ARB HC 002100]

It is troubling that any employee would say that he was "forced" to do something which was merely part of his job. In view of the fact that on March 7, 2007, the date Homer signed the statement that plaintiff was still working at Interview, that his tone was so denigrating to his former superior, it is further evidence of the pervasive hostility that defendants exhibited and encouraged toward plaintiff. The statement does not even have a veneer of objectivity.

However, logically, if Homer had to give plaintiff a copy of her calendar *before she left,* his claim that this practice demonstrates that he would have to stay later than plaintiff, makes no sense. Once he handed her the calendar, he was free to go.

-15-

There were no frauds. Additionally, the calendar changed regularly and it is unclear that whatever document that Mr. Homer was working from was correct, since Mr. Homer signed the statement about a year after these alleged erroneous claims are alleged to have taken place.

Indeed, Mrs. Fuller did give him receipts and told him to make sense of them and to make them fit because *that was his job*. If Mrs. Fuller were going to be asked about each receipt every time an expense report was prepared, she might as well have done the report herself. But that's why executives have assistants – to free them up to perform their executive tasks, the parts of the job that only they can do and not the assistant. Fuller *never* told any assistant to submit expenses that weren't business related.

Unlike other employees whose expenses were questioned contemporaneously and required resubmitting, nothing of the sort ever occurred with Mrs. Fuller. If there were any errors in the filings, and the allegations here are of barely a few hundred dollars over a year, they should have been raised at the time and resolved appropriately. At worst, plaintiff should have been questioned about them when she returned to work.

## Defendants Stoop to Gutter Tactics In Desperate Retaliation Attack

Perhaps the cheapest shot, and one that will undoubtedly infuriate any jury, is the gratuitous reference to Mrs. Fuller's weekly "psychiatrist" appointments on Mondays at 5 p.m. Demonstrating yet again his sloppy and casual way of relating, or fabricating facts, plaintiff was not under the treatment of a "psychiatrist." Like half of New York, plaintiff was, however, seeing a *psychotherapist.*

Homer claims that plaintiff told him to lie about to her superior, Publisher Sandra Brant, about where she was at the time of these appointments. Quite the contrary, plaintiff was open about these appointments, they were common knowledge in the office.

Moreover, plaintiff worked at Interview, a magazine started by Andy Warhol and at one time, at the cutting edge of American culture. Many executives and staff were "seeing a psychotherapist." In this environment plaintiff never would have had to hide her being in therapy.

The interjection of plaintiff's psychotherapy appointments, their intended dramatic mischaracterization as "psychiatric" visits into Homer's statement, is a mirror image of how plaintiff was treated after she took her FMLA leave, and represent precisely the type of gutter tactics that will offend a jury.

Defendants strain to accuse plaintiff with fabricated improprieties. However, not only are plaintiff's actions defensible item by item, but should this case go through discovery, we will examine every one of the claimed expenses of other company

-16-

officers, executives and employees, including the usage of company credit cards, checks and charges incurred by the company on behalf of such individuals.  That will make these baseless accusations against plaintiff for what is barely pocket change, seem imperceptibly minuscule.


**False Interrogatory Answers**

The signed *and sworn* Interrogatory responses state that the earliest date of defendants' investigation of plaintiff's alleged misdeeds was March 7, 2007 by way of a meeting between Deborah Blasucci and Joshua Homer. This is a clear fabrication on several accounts.

First, Blasucci wrote in her March 14, 2007 suspension letter to plaintiff that they had been investigating allegation of her "***illegal and unethical conduct*** in your capacity as Vice President/Associate Publisher [over the last] several weeks." Moreover, the Homer statement [BRANT ARB HC 002100-01] is dated March 7, 2007.

Homer was not an employee at the time of his signing of the statement. Yet the statement reads, "[b]ased on a review of Victoria's expense reports the following is a list of infractions that she perpetrated…" Homer then proceeded to recite a long laundry list of alleged "infractions" with descriptions and references to specific dates, amounts of cab fares, starting and stopping times of the cab and fare amount of a year earlier.

Considering Mr. Homer had not worked at Interview for about half a year by that time, it is *inconceivable* that the "investigation" only began on March 7, since clearly either he or others must have already sifted through voluminous expense records. Homer states that he worked for plaintiff from November 2005 to October 2006. His statement dated March 7, 2007 could not remotely be based on his *unaided* recollection of such a mundane task as the compiling and filing of expense reports.

Since Ms. Blasucci's March 14, 2007 suspension letter admits that they have been investigating Mrs. Fuller over the **"last several weeks,"** [*See* Blasucci suspension letter to plaintiff, March 14, 2007] defendants' sworn Interrogatory response that their investigation began on March 7, 2007, is palpably false.


**Interrogatory Answers Referring to LaFrance and Belezza "Statements" Was False**

The Interrogatory Answer no. 2 and 3 falsely claim to refer to "statements" of Marie LaFrance and "Adrian Bellazza." Neither alleged "statement" was signed by either employee…because they were not their statements.

-17-

Interrogatory no. 2 requested, *inter alia*, "Identify each document that defendants used at the time of plaintiffs termination that formed a factual basis upon which plaintiff was terminated." Interrogatory Response no. 2 refers to as one of these inculpatory documents as "BRANT ARB HC 000091-97 (Adrien Bellazza statements and notes regarding Fuller's 2005 Expense Reports)". It also refers to "BRANT ARB HC 000222-000225 (Marie LaFrance statements)".

Interrogatory no. 3 states, "State all facts referred to as part of defendants' "investigation," in defendants' Termination Letter, including identifying all documents which defendants used as a basis for the termination at the time it was effectuated."

Identical to the Interrogatory no. 2 response, defendants signed, sworn answer includes "BRANT ARB HC 000091-97 (Adrien Bellazza statements and notes regarding Fuller's 2005 Expense Reports) …BRANT ARB HC 000222-000225 (Marie LaFrance statement); "

These documents are neither statements of Ms. LaFrance nor of Adrien Bellazza. Rather, they are unsigned handwritten documents ***written by Debbie Blasucci.*** [BRANT ARB HC 000222-25] Both documents are written in the same hand, Blasucci's.

Moreover, the on a document defendants marked as one of the Adrien Bellazza statements, [BRANT ARB HC 000091] **it is highly unlikely that Mr. Bellazza would have misspelled his own name *twice*. The name is first misspelled as "Adrian Belazza" (containing a misspelling in both the first and last name) and then as "Adriane."**

There can be no doubt that this was a clear intentional misrepresentation. For example, Ms. Blasucci, who personally signed the sworn Interrogatory responses, could have stated that these were notes she took during a meeting with Adrien Bellazza or Marie LaFrance.

In fact, Blasucci does describe notes that she took at a meeting with William Anchin as "BRANT ARB HC 000080-83 (Notes taken by Deborah Blasucci during March 19, 2007 meeting with William Murray of Anchin Block & Anchin LLP)."

The distinction between Blasucci's actions regarding these different documents is that on the one hand, LaFrance and Bellazza were merely Blasucci's subordinates at Interview and so she took the liberty to lie about the origin of those documents based on her power and authority over them. They would have no recourse against her. However, she would not attempt to claim that her own hand written notes were those of an outside accountant because such a misrepresentation could wind up with potentially serious legal repercussions.

-18-

Additionally, Blasucci made numerous insertions in the middle of sentences in her notes, above the line and in the margins, such as "whether it was true" or "which wasn't true." Incredibly, Blasucci was attempting to embellish documents which she already was falsely claiming were witness statements.

The alleged "LaFrance statement" begins with an unfinished sentence that states that LaFrance "trained 2 days with Josh Homer…Josh explained how to fill out VF expense report." [BRANT ARB HC 000222] This is the same Josh Homer who claims that he knowingly assembled and filed false expense reports and who was rehired back to the company and promoted *after providing such a written statement about his participation in this alleged fraud*.

Accordingly, it appears that if Mr. Homer was participating in a fraud, he was training Ms. LaFrance to do the same. Ms. LaFrance, who had only worked for some two months for Interview before Mrs. Fuller left on FMLA leave, has also since been promoted. Yet if both of these individuals helped participate in a fraud against Interview Magazine, they should have been fired – not retained or rehired – and certainly not promoted.

## Calendar Relied Upon for Theft Claims Was Not Maintained By Plaintiff and Was Inaccurate

In making their theft allegations, defendants erroneously rely on inaccurate calendars *maintained by Mrs. Fuller's assistants*. Defendants claim that these calendar printouts provide some kind of evidence that various expenses claims were fraudulent. However, these calendars are grossly unreliable. For example, BRANT ARB HC 000928-950, which represents the end of July 2005 through the end of 2005, erroneously shows barely any entries for a half year period. During this time, Joshua Homer was plaintiff's assistant. Why are months of records that Homer was responsible for so inaccurate?

We don't know how these documents were recreated for this law suit, but clearly, they are inaccurate. In addition to ample opportunities for the calendar to have been tampered with, the production of a calendar with an entire half year that is so grossly inaccurate, eliminates any possibility that these calendars can be reasonably relied upon. It also legitimately calls into question the accuracy and veracity of the people who kept them, plaintiff's assistants – let alone whether the documents produced are accurate copies of the calendars.

Because none of these alleged frauds were contemporaneously documented or brought to either plaintiff's attention or defendants' attention at the time they were submitted, defendants rely almost exclusively on these calendars to recreate plaintiff's activities. ***However, these computerized calendars relied upon by defendants were***

-19-

**not even maintained by the plaintiff. They were maintained by her assistants.** They were routinely wrong and outdated and regularly contained erroneous information.

During all of Mrs. Fuller's tenure, Interview had a very low tech calendaring system. Actually, it was not a system. *Mrs. Fuller did not even have the ability to make entries into the calendar from her own desktop computer*. The calendars were not networked. Entries were made by Mrs. Fuller's assistants and maintained on the assistant's desktop computer. The procedures for making entries varied. Many entries were never made. Changes in plaintiff's schedule were often never noted in the calendar.

For example, sometimes an Interview salesperson would schedule an outside appointment or meeting by giving the information to the assistant. Such an appointment should have been placed in the calendar but might not be. Sometimes, a salesperson would come directly to Mrs. Fuller and it would *not get entered in the calendar*, particularly if the meeting were to take place either that day or the next day. Other times, *a sales person might come into Mrs. Fuller's office and ask her to leave on a sales call at that time* and no entry would be made. In addition, if a client contacted Mrs. Fuller directly and a meeting was scheduled for that day or possibly the next day, frequently those meetings would not go into the calendar.

Because the calendar was not an accurate reflection of Mrs. Fuller's actual activities, it certainly could not have formed the basis of such serious claims such as the theft of company funds. Not only would Mrs. Fuller's former assistants have known their unreliability, but the clear inaccuracy of a half year of the calendar would have led any reasonable person to doubt their accuracy. One would think that without having any reliable documentation (or even with it), a company that has had the years of dedication of an executive such as Mrs. Fuller, would have at least questioned her about the accusations before deciding to terminate her.

On the other hand, there would have been no reason to ask Mrs. Fuller about these claims of dishonesty if the defendants decision to terminate was retaliatory and discriminatory. In such a case, the truth could only be an impediment to their decision they had already made to terminate Mrs. Fuller.

## Absence of Expert Accountant Documentation Leads to Adverse Inference

Defendants hired William Murray of Anchin Block & Anchin, LLP, a public accounting firm, to examine the financial records. (*See* response to Interrogatory no. 2 referring to notes taken by Deborah Blasucci during March 19, 2007. [BRANT ARB HC 000080-83] If an employee were being terminated, in whole or in part, for claims of financial fraud or theft, and one hires an accountant to examine the books for that

purpose, one would expect that before firing the employee, in particular a top level executive, that the accountant would have given, or would have been asked for a written opinion to support that decision.

Of the thousands of pages of documents exchanged, there is not a single document to or from the accountants. Moreover, even Blasucci's notes from her meeting with the accountant [Interrog. Ans. 2 (a) (i)], does not allege any such conclusions. Certainly, the hiring of the accountants and the absence of a single page of documentation on their part alleging any improprieties, would lead to an inference that they never concluded any wrongdoing.

The timing of the accountant's involvement, beginning after plaintiff's return to work, and before her termination, clearly shows that they were hired to gun for plaintiff – but apparently came up empty.


**Claims of "Gross Insubordination" Constitute "Pretext"**

Defendants claim among their reasons for plaintiff's termination were "acts of gross insubordination and repeated uncorrected insubordination in violation of Section 6.1(d) of her Employment Agreement." [Interrogatory Resp. 2 (b)]

This was a fabrication intended to serve as a pretext that a contractual ground to terminate plaintiff existed. The contract provides at Section 6.1 (Termination for Cause), that the "[employer may terminate the Employee's employment at any time "for cause" with immediate effect upon delivering written notice to the Employee…[for](d) gross insubordination or repeated uncorrected insubordination after written warning by the company's President or other officer of the company…"

Plaintiff never received any such "warning" as required pursuant to contract. The allegation in defendants' interrogatory answers that plaintiff's "failure to comply with Brant Publications' instruction not to contact employees…" is erroneous. That "instruction" came from Marie Mascaro, the director of human resources. Mascaro could not issue any such warning as she was neither the "President" nor an "officer" of plaintiff's employer.

The Blasucci suspension letter of March 14, 2007 purports to place plaintiff on notice for continued "failure to submit the doctor's certification of your fitness for return to work required in the FMLA form and specifically demanded by me in two emails to you on March 5th and 7th is gross insubordination."

Had defendant truly cared about insisting on a return to work certificate, defendant would have not allowed her to return from work on March 2, 2007. Pursuant to the FMLA, the worst an employer can do for the failure to provide a certificate of ability to return to work, is delay the employee's return to work until the certificate is

-21-

provided. 29 cfr 825.301 (a) and (b). While we believe that neither under the law nor under the facts here did defendant have the right to demand the additional certification, *under no circumstances does the failure to provide such a certificate provide for the right to terminate,* which defendants are claiming herein.

However, certification had already been filled out by plaintiff's doctor and hand delivered to Ms. Mascaro on February 9, 2007 by Graham Fuller, stating that Mrs. Fuller would return to work on March 2, 2007. Accordingly, when plaintiff returned to work on that date, there certainly was no reason for surprise, nor the spate of personal attacks, nor any valid reason for locking plaintiff out of her office and keeping her waiting in the reception area.

On March 15, 2007, plaintiff provided the additionally requested certification with the doctor's note regarding plaintiff's ability to return to work. Mrs. Fuller did obtain the additional certificate within 10 days of the request. Mrs. Fuller was not "insubordinate," let alone "grossly insubordinate." On the contrary, these fabricated requirements are the precise evidence of pretext that show retaliation.

Defendant also claims as insubordination, allegations of plaintiff's "failure to comply with Brant Publications' instruction not to contact employees and/or clients during her FMLA leave in 2006 and 2007." [Interrogatory Resp. 2 (b)] While the directive makes no sense, except for a terminated or suspended employee, no such policy existed nor was any such rule ever implemented with other employees on medical leave. The use and implementation of this restriction was itself discriminatory and retaliatory, and intended to isolate plaintiff from the rest of the workforce. In retrospect, as of the day that Deborah Blasucci asked Vince Frezzo to document whether plaintiff "looked sick," it is clear that defendants intended to isolate plaintiff. Plaintiff's continued contact with employees would have interfered with defendants' efforts to coerce employees to try to implicate plaintiff in all types of wrongdoings, ranging from falsely taking a medical leave to stealing from the company.

The claim of Mrs. Fuller's "circumvention of Sandra Brant's directions regarding the creation of an Interview website," did not constitute a written warning under the employment agreement. Nor did plaintiff circumvent any directions of Sandra Brant in this regard. Rather, Mrs. Fuller was trying to expedite the setting up of a website, in which Mrs. Brant was clearly dragging her feet. The creation of an Interview Magazine website was only about a decade behind all other similar magazines. Since Mrs. Brant left the magazine, even defendant Peter Brant has said publically that the development of the Interview website was key to the new strategy at the magazine. Mrs. Fuller's attempts to move Interview forward indicate further that she is the kind of visionary who would have served Interview well as Publisher, in precisely the direction that Peter Brant has taken the magazine since Mrs. Brant's departure.

**Claims of Poor Performance/Failure to Perform Duties Were Pretextual**

-22-

The claims that plaintiff was terminated for poor performance are similarly without any basis. They again are inserted to use the contract as pretext for discharge. Ms. Blasucci loses all credibility by making statements like "suffice it to say that you have never performed all of your duties as set forth in the contract." [Blasucci, March 9, 2007 email]

How did plaintiff work at Brant Publications for 13 years and get continually promoted to the position of Vice-President, Associate Publisher, in charge of roughly a dozen employees and responsible for millions of dollars revenue and budget? Fuller was initially hired as an advertising sales person, promoted to Advertising Director, then promoted to Associate Publisher, and finally to Vice-President, Associate Publisher.

Blasucci's March 9, 2007 email claiming that "you have never performed all of your duties as set for in the contract," was not mere hyperbole. It was a clear effort to establish a contractual pretext for terminating plaintiff. However, plaintiff obviously performed her duties. Plaintiff's "Duties" as provided for in Section 2 of the Employment Agreement, were, "[t]he Employee shall serve as Associate Publisher of the Employer, with such duties as are customarily associated with such position. The Employee's duties shall include being responsible for overseeing the Employer's marketing, promotion, publicity and sales personnel for advertising, meeting with clients, maximizing the Employer's advertising revenue."

Notwithstanding the vagueness of that definition, defendants had the right under the contract to discharge plaintiff for "material and continuing failure by the Employee to perform the duties described in this Agreement for at least sixty (60) days after written warning by an officer of the company." [*See* Employee Agreement, 6.1.] **Defendants *never* issued any such warning.**

Only in her email of March 5, 2007, over three months after the fact, does Blasucci try to bootstrap a claim that plaintiff was not performing her duties by alluding to alleged discussions in a meeting on November 21, 2006 where it was claimed that defendants complained of plaintiff's poor performance. Only following plaintiff's return to work on Friday, on March 2, 2007, did Blasucci send off this frantic three page missive on March 5, 2007, which referred back to a *November 21, 2006* meeting. While Blasucci failed to memorialize these allegations for over three months, she would continue over the next two weeks to send a barrage of self-serving communications to plaintiff.

## Retaliation Claim Against Defendants Valid

As the old adage goes, "it's not the crime, it's the cover up." This adage applies perfectly here since defendants' concoctions of fabricated job failures are the precise evidence of pretext that show retaliation. Defendants tried to force plaintiff out by making

her life miserable – they isolated her from coworkers, they refused to pay her full compensation while out of leave, they harassed her when she returned, humiliated her by keeping her waiting in the reception and then cobbled together a campaign of fabrications as pretext to claim that plaintiff stole from the company and thereby violated her contract, in order to discharge her. Most any jury will not merely see the truth in plaintiff's claims but be outraged by the diabolical and malicious efforts of defendants that would lead to a substantial verdict for compensatory, liquidated and punitive damages.

## LEGAL THEORIES OF DEFENDANTS' LIABILITY

Defendants are liable for compensatory damages, double damages and punitive damages under the FMLA and New York City Human Rights Law.

## Defendants' Liability Pursuant to FMLA

Here, plaintiff need merely prove that she was entitled to the leave and that her full rights and entitlements were denied her. No intent is required on the part of the employer. "Because the issue [in an interference claim] is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer."); *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 712 (7th Cir. 1997)

The court in *Bearley v. Friendly Ice Cream Corp.,* 322 F. Supp.2d 563, 571 (M.D.Pa. 2004), describes the distinction between interference and discrimination/retaliation claims under the FMLA, and the legal standards applicable to the latter claims, as follows:

Courts have recognized two distinct causes of action under the Family and Medical Leave Act (hereinafter FMLA). First, a plaintiff may pursue recovery under an "interference" theory. This claim arises under 29 U.S.C. § 2615(a)(1), which makes it unlawful for an employer "to interfere with, restrain, or deny" an employee's rights under the FMLA. Under an interference claim, it is plaintiff's burden to demonstrate that she was entitled to a benefit under the FMLA, but was denied that entitlement. *Parker v. Hahnemann Univ. Hosp.,* 234 F. Supp. 2d 478, 485 (D.N.J. 2002).

In denying plaintiff her full benefits, i.e. her full compensation to which she had the right, plaintiff has the right to assert this claim. All a fact finder has to do is determine that some benefit was interfered with, such as defendants' refusal to pay plaintiff her full salary pursuant to the Interview policy.

## Retaliation Claim Pursuant to FMLA

The second type of recovery under the FMLA is the "retaliation" theory. This claim arises under 29 U.S.C. § 2615(a)(2), which makes it unlawful for an employer to discriminate against an employee who has taken FMLA leave. Retaliation claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792. To establish a prima facie case of retaliation under the FMLA, a plaintiff must show: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the adverse action and Plaintiff's exercise of her FMLA rights.

After establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action.  If the employer offers a legitimate, nondiscriminatory reason, the burden is shifted back to plaintiff to establish that the employer's reasons are pretextual.  *Bearley v. Friendly Ice Cream Corp.,* 322 F. Supp.2d 563, 571 (M.D.Pa. 2004).

Plaintiff's request alone for a leave constitutes a statutorily protected activity. Plaintiff suffered numerous adverse employment actions that are causally connected to her exercise of these rights. Defendants' reasons can easily be demonstrated to be pretextual.

## FMLA Damages

An employer who violates the FMLA is liable to an affected eligible employee for monetary damages and equitable relief as may be appropriate, including reinstatement and promotion. The monetary damages shall be equal to:

> (1) the amount of any compensation denied or lost to the employee because of the violation, including front pay, plus,
>
> (2) interest on that amount, plus,
>
> (3) as liquidated damages, an additional amount equal to the sum of the actual damages and interest. However, the sum for liquidated damages may be reduced by a court if it finds that the violation was in good faith and the employer had reasonable grounds for believing it had not violated the Act. 29 U.S.C.§ 2617(a).

It is defendants' burden to demonstrate "good faith." Ignorance of the FMLA's requirements is no defense to liquidated damages. *Employee Rights Litigation: Pleading and Practice, Matthew Bender, 2 § 5B.07.*

If an eligible employee brings a successful action to recover monetary damages or obtain equitable relief, a court must, in addition to any judgment awarded to the plaintiff, require the defendant to pay to the successful plaintiff reasonable attorney's fees, reasonable expert witness fees and other costs of the action.

The FMLA entitles eligible employees to reinstatement at the end of their FMLA leave to the position held before taking leave or an equivalent position. Parker v. Hahnemann, 234 F. Supp. 2d at 489. If the plaintiff meets this burden, then it is defendant's burden to demonstrate that she would have been denied reinstatement even if she had not taken FMLA leave. Id. Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004).

It is defendants' burden to prove mitigation and that plaintiff failed to obtain "substantially equivalent job opportunities" that were reasonably available to her. The fact finder reduces the award of damages by the amount of the wages that plaintiff reasonably would have earned if she had obtained those opportunities. See Third Circuit Model Civil Jury Instructions (Ch. 10), "Instructions For Claims Under the Family and Medical Leave Act" at 10.4.1; 10.4.2.

In this case, plaintiff mitigated her damages, by obtaining a job that turned out not to be substantially equivalent. Plaintiff went to work for Rodale Press, with the title of "Associate Publisher" for Women's Health magazine. However, plaintiff's duties were not those of an Associate Publisher, but rather she was acting as the advertising director. Accordingly, plaintiff sought another position as Associate Publisher with Conde-Nast's Men's Vogue. Within some two months of her appointment to that position, plaintiff was terminated as a result of a change in management and a staff reduction. Her position as Associate Publisher at Men's Vogue was eliminated. Plaintiff has since been hired as a sales representative for artnet.com at a salary of $150,000 annually, less than half her prior salary as V.P., Associate Publisher for Interview Magazine.

## New York City Human Rights Law Affords Broad Measure of Damages and Personal Liability

The NYCHRL is significantly broader in its scope of protection, bases for liability, parties who can be held liable, and damages. Under the NYCHRL, a person with a "disability" may make a claim for damages for discrimination and retaliation. The definition of "disability" under the NYCHRL is significantly broader than under federal law and has been consistently construed as such. The term "disability" is defined as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." It includes a "physical, medical, mental, or psychological impairment." NYC Admin. Code § 8-102 (16) It includes actual or "perceived" disabilities. N.Y.C. Admin. Code § 8-107(1)(a).  **Plaintiff qualifies as having a "disability" under the NYCHRL.**

The NYCHRL provides for compensatory damages, including back pay and front pay, damages for emotional distress, punitive damages, as well as interest and attorneys fees and costs.

**Punitive Damages Available**

Punitive damages are available pursuant to the NYCHRL against each defendant. Punitive damages are appropriate where a defendant has acted with malice or a reckless disregard for the protected rights of plaintiff. Defendants actions meet the higher "malice" standard. Accordingly, plaintiff need not be concerned with the lower "reckless disregard" standard.

Any award of punitive damages would require the jury's evaluation of personal assets and income in assessing punitive damages against all the individual defendants. Clearly, the corporate and individual defendants have substantial means. In discovery, all defendants would have to provide complete disclosure of assets and income, including extensive land holdings, art collections and assets, such as Peter Brant's stake in White Birch Paper Company.

The threshold for individual liability pursuant to the NYCHRL is not very high, providing for individual liability for aiding and abetting, regardless of the individual's role. Admin. Code **§ 8-107 (6);** Sanabria v. M Fabrikant & Sons, Inc., 2008 N.Y. Misc. LEXIS 2400 (N.Y. Sup. Ct. 2008).

**DAMAGES CALCULATION**

**Severance Pay Pursuant to Contract and As Damages Under FMLA and NYCHRL: $356,015.89**

Plaintiff was entitled to thirteen months severance pay in the amount of **$356,015.89.** Pursuant to § 6.4 of the employment agreement regarding termination without cause, plaintiff was entitled to one month's severance for every year of her employment. Plaintiff was employed with Interview for 13 years. Plaintiff's compensation was based on her base salary plus her annual commissions, which was a percentage of the annual budget plaintiff oversaw.  Her base pay was $200,000.00. Her 2006 commissions were $120,215.00. In 2007 her contract commissions would have increased by 7 %, equal to the increase in budget for the same year. Accordingly, the 2007 commissions would have been $128,630.05. The 13 month total for salary and commissions equals $356,015.89.

**Damages for Defendants' Wrongful Refusal to Pay Past Commissions: $53,595.85**

Defendant stopped paying plaintiff the commissions while plaintiff was still employed by defendants. Defendants owed some five months worth of commissions during her employment and while on leave since the company policy was to pay full compensation during leave. With a termination date of March 27, 2007, pursuant to section 5.2 of the employment agreement, Plaintiff is owed commissions through the June 2007 issue. Annual commissions for 2007 would have been. $128,630.05. Five months commissions would have been **$53,595.85**

## Liquidated Damages: $819,223.48

Plaintiffs actual damages based on lost compensation due to discrimination and breach of contract for the period from March 27, 2007 to June 27, 2008 (13 months from the date of termination) are **$409,611.74**. For defendants' violation of FMLA, the court is required to award interest on this amount, **plus liquidated damages in the amount of the actual damages,** unless the employer demonstrates that it acted in good faith and had reasonable grounds for believing it had not violated the Act. Defendants cannot demonstrate this. Any attempt to do so would only further infuriate a jury. As a matter of law, plaintiff is entitled to **$819,223.48** plus interest, through June 27, 2008.

## Future Lost Wages $4,375,000

As of June 27, 2008 when plaintiff's severance would have expired, plaintiff was employed by artnet.com (since June 1, 2008), as an advertising sales manager. Her annual salary is ▓▓▓▓▓▓▓▓ This constitutes an *annual loss of* ▓▓▓▓▓ compared to her salary of $325,000 at Interview. It is plaintiff's position is that she would have been selected for the Publisher position at Interview upon the termination of Mrs. Brant from that position, and that the proper measure of damages for their discriminatory and retaliatory acts would be the total compensation package for the current Publisher. Notwithstanding, plaintiff was involuntarily terminated from her position of 13 years and cannot even obtain a reference from her prior employer because of the claims of theft by the company.

Accordingly, plaintiff no longer has the same ability to use the good name she had the right to. Plaintiff's damage to reputation can be calculated as continuing for the remainder of her expected work life, some 25 years, at $175,000 per year, totaling **$4,375,000**.

## Defendants Caused Plaintiff To Severe Emotional Injuries: ▓▓▓▓▓▓▓
▓▓▓▓▓▓▓

Defendants' vicious actions wreaked havoc on plaintiff, causing her to suffer from clinical depression and anxiety. Plaintiff's damages can be reasonably estimated

-28-

between ███████████████ Since defendants began their discriminatory and retaliatory actions at the very inception of plaintiff's initial FMLA leave on December 2, 2006, plaintiff has since sought treatment from her physician, psychotherapist and a psychiatrist, and remains under active care. In addition to harassing plaintiff since she first took her first FMLA leave, refusing to pay her commissions, isolating plaintiff, defendant finally suspended and terminated plaintiff on fabricated claims of **"certain illegal and unethical conduct."** This devastated plaintiff, particularly after 13 years of dedicated and loyal service.

Plaintiff had a stable home life. She has a 7 year old daughter and is married to Graham Fuller,███████████████████████████████████████

While it may have been upsetting to be terminated by your employer of 13 years, defendants had the right to do so. Unpleasant as it may have been, all that the employer would have had to do, would be to pay plaintiff what she was owed pursuant to her contract.

Rather, in direct response to plaintiff's request to take a medical leave, plaintiff was harassed, cheated of her compensation, suspended and fired, with a parting salvo of false accusations of criminal and unethical behavior. The emotional repercussions would be devastating to anyone, and were to Mrs. Fuller. They would certainly be a difficult matter to explain in future professional contexts.

## Plaintiff Suffered Clinical Depression and Anxiety Due to Defendants' Actions

Prior to defendants' actions against plaintiff, Mrs. Fuller had **never been under the care of a psychiatrist nor placed on psychotropic medication.** Plaintiff has since been placed on psychotropic medication for anxiety, which she remains on to date.

Due to her anxiety, in December 2006, ███████████, M.D., plaintiff's internist, prescribed Klonopin twice daily. Klonopin is prescribed for anxiety and panic disorder. *Plaintiff had never before taken psychotropic medications.*

Plaintiff was diagnosed with Anxiety Disorder by Clinical Psychologist, ███████ ██████Ph.D. Plaintiff also increased her psychotherapy sessions from once weekly to twice weekly in early 2007 with Dr. Scarvalone as her symptoms became increasingly acute.

Because of the continuing nature of her symptoms and condition, plaintiff's internist and psychotherapist believed that her medication management should be taken over by a psychiatrist. Plaintiff came under the treatment of ███████████, M.D. Plaintiff continues to suffer from symptoms related to this traumatic experience of

-29-

termination under accusations of theft from her employer of 13 years. She has been diagnosed by Dr. Davis with:

> Adjustment disorder with anxiety;

> Depression;

> Adjustment Disorder With Mixed Anxiety and Depressed Mood;

> General anxiety disorder.

Dr. Davis causally relates these conditions in their current presentation to defendants' termination of plaintiff with claims of theft. He continues to prescribe Klonopin, 0.5 mg. 2-3 times daily.

Plaintiff's emotional damages and loss of enjoyment of life are modestly estimated at ███████████████████

**Punitive Damages:** ███████████████

It is well established that a plaintiff is entitled to punitive damages in the amount of up to five to six times compensatory damages, even in view of limitations placed on such damages by the U.S. Supreme Court based on due process claims, under the progeny of <u>BMW of North America v. Gore</u>, 517 U.S. 559, 581 (1996).

Here, plaintiffs compensatory damages, including past lost wages, future lost wages, damage to reputation and emotional damages, is in the several millions of dollars. Plaintiff has the right to punitive damages to deter defendants from committing, aiding or abetting such similar retaliatory and discriminatory behavior in the future. While a punitive damages award of over **$10,000,000** would be sustainable based on due process concerns, an award of ████████████████, in view of the malice behind these actions and the extraordinary wealth of the defendants, and the need for a significant award to deter future behavior. The size of such a punitive award would also be consistent with the income and assets of the defendants. Punitive awards are necessarily measured, in part, by the wealth of the offending actor, because to entities and individuals whose wealth measures in the hundreds of millions, a few hundred thousand dollars would hardly be a meaningful punishment.

-30-

**Attorney Fees:** <span style="background:black">    </span>

Plaintiff is entitled to attorneys fees and costs pursuant to both the FMLA and NYCHRL. It is estimated, at present, that plaintiff's attorneys fees are in the area of <span style="background:black">    </span>

## Conclusion

Plaintiff demands <span style="background:black">    </span> to settle this matter, at this juncture prior to undertaking complete discovery.

I look forward to hearing from you to resolve this serious matter.

> Very truly yours,
> LAW OFFICES OF ALAN J. RICH, LLC
>
> /s/
> By: ALAN J. RICH